In re LORAZEPAM & CLORAZEPATE ANTITRUST LITIGATION.

Federal Trade Commission, Plaintiff,

v.

Mylan Laboratories, Inc.
et al., Defendants.

and

State of Connecticut, et al., Plaintiffs,

v.

Mylan Laboratories, Inc.
et al., Defendants.

and

United Wisconsin Services,
Inc., et al., Plaintiffs,

v.

Mylan Laboratories, Inc.
et al., Defendants.

and

Arkansas Carpenters Health and
Welfare Fund, Plaintiff,

v.

Mylan Laboratories, Inc.
et al., Defendants.

Nos. MDL 1290(TFH), 99MS276(TFH).

United States District Court,
District of Columbia.

Feb. 1, 2002.

Richard Alan Feinstein, Federal Trade Commission, Bureau of Competition, Washington, DC, for Federal Trade Commission.

Peter H. Williams, Office of Attorney General/FL, Tallahassee, FL, Kimberly L. Long, Office of Attorney General, FL, Economic Crimes–Antitrust Section, Tallahassee, FL, Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for Florida.

Robert W. Pratt, Chicago, IL, Don R. Sampen, Illinois Attorney General's Office, Chicago, IL, Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for Illinois.

Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for Minnesota, North Carolina, and Wisconsin.

Susan E. Raitt, Robert L. Hubbard, John Andrew Ioannou, Attorney General of New York, New York City, Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for New York.

Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, Mitchell Lee Gentile, Rajeev Kumar Malik, Dorren Claire Johnson, Ohio Attorney General's Office, Columbus, OH, for Ohio.

Terry A. Lupia, Pennsylvania Attorney General's Office, Harrisburg, PA, Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for Pennsylvania.

Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, Douglas L. Davis, West Virginia Attorney General's Office, for West Virginia.

Michael David Hausfeld, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Ellen Schiff Cooper, Maryland Office of Attorney General, Antitrust Division, Baltimore, MD, for St. Charles Hosp. and Rehabilitation Center.

Daveed Schwartz, Attorney General of Alaska, Dept. of Law, Anchorage, AK, for Alaska.

Mark Pryor, Office of Attorney General of Arkansas, Little Rock, AR, for Arkansas.

Natalie S. Manzo, Office of Attorney General of California, Los Angeles, CA, for California.

Maria E. Berkenkotter, Jennifer F. Connollu, Office of Attorney General of Colorado, Denver, CO, for Colorado.

Joseph Stephen Betsko, Attorney General of Pennsylvania, Antitrust Section, Harrisburg, PA, Arnold B. Feigin, MacKenzie Hall, Office of Attorney General of Connecticut, Hartford, CT, Ann Beimdiek Kinsella, Minnesota Attorney General's Office, St. Paul, MN, for Connecticut.

Donald Stuart Cameron, Office of Corp. Counsel, Washington, DC, for Dist. of Columbia.

Brett T. DeLange, Idaho Attorney General, Boise, ID, for Idaho.

John F. Dwyer, Iowa Dept. of Justice, Des Moines, IA, for Iowa.

David Vandeventer, Office of Attorney General of Louisiana, Baton Rouge, LA, for Kentucky.

Jane Bishop Johnson, Baton Rouge, LA, for Louisiana.

Stephen L. Wessler, Augusta, ME, for Maine.

Jennifer Granholm, Assistant Attorney General's Office, Consumer Protection Division, Antitrust Franchise Section, Lansing, MI, for Michigan.

Michael J. Delaney, Office of Attorney General of MO, Consumer Protection Division, St. Louis, MO, for Missouri.

Patricia A. Madrid, Office of Attorney General of NM, Antitrust Unit, Albuquerque, NM, for New Mexico.

Steven J. Leippert, Oklahoma City, OK, for Oklahoma.

Andrew E. Aubertine, Dept. of Justice, Assistant Attorney General, Salem, OR, for Oregon.

C. Havird Jones, Jr., Office of Attorney General of South Carolina, Columbia, SC, for South Carolina.

Jeffrey P. Hallem, South Dakota Attorney General's Office, Pierre, SD, for South Dakota.

Dennis J. Garvey, J. Patrick Riceci, Office of Attorney General of Tennessee, Nashville, TN, for Tennessee.

Kelly Garcia, Office of Attorney General of Texas, Austin, TX, for Texas.

Wayne Klein, Office of Attorney General of Utah, Antitrust Section, Salt Lake City, UT, for Utah.

Rebecca Ellis, Julie Brill, Office of Attorney General of Vermont, Montpelier, VT, for Vermont.

Marta Lawy, Attorney General of Washington, Seattle, WA, for Washington.

Mary Nicole Strimel, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Thomas Campbell, Gardner, Carton & Douglas, Chicaago, IL, for Advocate Health Care.

Herbert T. Schwartz, Williams, Bailey Law Firm, LLP, Houston, TX, for McMakin Enterprises, Inc., L&J Pharmacies, Inc., and Prescription Mart.

Jack S. Sando, Bethesda, MD, Bernard Persky, Barbara J. Hart, Hollis L. Salzman, Ngozi Okaro, Goodkind, Labaton, Rudoff & Sucharow, New York City, for United Wisconson Services.

Thomas Campbell, Gardner, Carton & Douglas, Chicago, IL, for Dik Drug Co., Harvard Pilgrim Health Care, and Oxford Health Plans.

Bernard Persky, Robert S. Schachter, Zwerling, Schachter & Zwerling, Seattle, WA, for Plaintiffs in the Indirect Purchaser Actions.

Reuben Guttman, Provost & Umphrey Law Firm, LLP, Washington, DC, for Arkansas Carpenters Health and Welfare Fund.

Robert T. Rhoad, Porter, Wright, Morris & Arthur, Washington, DC, for Blue Cross and Blue Shield.

David Hensler, Hogan & Hartson, LLP, Washington, DC, Robert N. Kavitz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Seth E. Brown, Morrison & Foerster, LLP, McLean, VA, Linda P. Nussbaum, Pomerantz, Haudek, Block & Grossman, New York City, Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, IL, Hollis L. Salzman, Goodkind, Labaton, Rudoff & Sucharow, New York City, Diane Kelleher, U.S. Dept. of Justice, Civil Division, Federal Programs Branch, Washington, DC, John F. Kinney, Freeman, Freeman & Salzman, PC, Chicago, IL, Martin Seidel, David Park, James Miller, Keven J. Arquit, John K. Carroll, Clifford, Chance, Rogers & Wells, LLP, New York City, Steven A. Newborn, Joseph J. Simmons, Clifford, Chance, Rogers & Wells, LLP, Washington, DC, Michael O. Ware, Mayer, Brown, Rowe & Maw, New York City, Stephen L. Klimjack, Jackson, Taylor, Martino & Hedge, Mobile, AL, Meredyth Smith Andrus, Office of the Attorney General of MD, Antitrust Division, Baltimore, MD, Craig G. Harley, Atlanta, GA, Barron Grier, Columbia, SC, Robert S. Schachter, Zwerling, Schachter & Zwerling, Seattle, WA, for Mylan Laboratories, Inc.

Jonathon R. Tuttle, Timothy K. Beeken, Charles D. Atkins, Debevoise & Plimpton, New York City, for Cambrex Corp. and Profarmaco, S.R.L.

Peter Dean Isakoff, David A. Hickerson, Weil, Gotshal & Manges, LLP, Washington, DC, for Gyma Laboratories of America, Inc.

Sidney Samuel Rosdeitcher, Michael P. Bowen, Lewis Farberman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for SST Corp.

David Hensler, Hogan & Hartson, LLP, Washington, DC, for Mylan Pharmaceuticals, Inc. and UDL Laboratories, Inc.

Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, PLLC, Washington, DC, for Aetna US Healthcare.

Vaughan Finn, Ross H. Garber, Shipman & Goodwin, Hartford, CT, for United Health Group.

Arhtur Norman Lerner, Michaels & Bonner, PC, Washington, DC, for Health Net, Inc.

### MEMORANDUM OPINION
### Re: Settlement

THOMAS F. HOGAN, Chief Judge.

Pending before the Court are several motions for final approval of various settlement agreements reached in this MDL action. The Federal Trade Commission and all fifty states and the District of Columbia seek final approval of their settlement agreements with the defendants, which this Court preliminarily approved on April 27, 2001, and the third party payors seek final approval of settlement agreements preliminarily approved on February 9, 2001. Upon careful consider-

ation of the motions and the affidavits, declarations, and reports filed in support thereof, the objections to the settlements filed by various class members, the representations made by all parties at the fairness hearing held on November 29, 2001, and the entire record herein, the Court will grant each motion.

## I. BACKGROUND[1]

### A. Plaintiff States

On December 22, 1998, ten states ("Litigating States") and the Federal Trade Commission ("FTC") filed lawsuits with this Court, charging the defendants with entering illegal agreements to monopolize the markets for the generic anti-anxiety drugs, lorazepam and clorazepate, in violation of various federal and state antitrust laws.[2] On February 8, 1999, the Litigating States amended their complaint, adding twenty-one states and the District of Columbia as plaintiffs.[3] On May 13, 1999, Maryland joined the other thirty-two Litigating States.[4]

After extensive discovery was conducted, the parties began to explore the possibility of settlement in late Spring 2000. The FTC, thirty-three Litigating States, Mylan, Cambrex, Profarmaco, and Gyma reached an agreement in principle in August 2000, under which the defendants would pay $100 million toward consumer and state agency compensation and an additional $8 million toward costs and fees for the investigation and litigation in this matter. In return, the thirty-three Litigating States agreed to exert their best efforts to bring into the settlement eighteen states ("Joining States") that were not yet a part of this litigation. They were successful in this endeavor, and on February 1, 2001, all fifty states and the District of Columbia ("Plaintiff States") jointly filed a third amended complaint.[5] At the same time, the Plaintiff States filed two settlement agreements for the Court's review: the "Mylan Settlement Agreement" between the FTC, Plaintiff States, Mylan, Cambrex, Profarmaco, and Gyma; and the "SST Settlement Agreement" between the Plaintiff States and SST. After a hearing on April 27, 2001, the Court preliminarily approved both settlement agreements, the distribution plans, and the notice plan and consumer claims procedure, and it conditionally certified a class of plaintiffs for purposes of settlement only. The FTC and Plaintiff States now seek final approval of the settlements.

### B. Third Party Payors

There are also two third party payor actions before the Court. On May 3, 1999,

---

1. The underlying alleged antitrust violations in this case has been thoroughly discussed in previous decisions of this Court, *e.g.*, *FTC v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 32–35 (D.D.C. 1999); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 14–17 (D.D.C.2001), and thus will not be reiterated in full measure here.

2. The original ten Plaintiff States in *Connecticut v. Mylan Labs., Inc.*, No. 98–3115, were Connecticut, Florida, Illinois, Minnesota, New York, North Carolina, Ohio, Pennsylvania, West Virginia, and Wisconsin. They named as defendants Mylan Laboratories, Inc. ("Mylan"), Cambrex Corporation ("Cambrex"), Profarmaco S.R.L. ("Profarmaco"), Gyma Laboratories of America, Inc. ("Gyma"), and SST Corporation ("SST"). The FTC's action, *FTC v. Mylan Labs.*, 62 F.Supp.2d 25, named Mylan, Cambrex, Profarmaco, and Gyma, but excluded SST.

3. The states, in addition to the District of Columbia, added in the amended complaint were Alaska, Arkansas, California, Colorado, Idaho, Iowa, Kentucky, Louisiana, Maine, Michigan, Missouri, New Mexico, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington.

4. *Maryland v. Mylan Labs., Inc.*, No. 99–1158.

5. In addition, the FTC and the defendants worked out the terms of a "Stipulated Permanent Injunction" and jointly moved for its approval on November 29, 2000. The Court reviewed the injunction with the parties on the record at a hearing held on December 4, 2000, and it approved it at a hearing held on February 9, 2001. Under the February 9, 2001 Order and Stipulated Permanent Injunction, the defendants were required to pay the $100 million, $71,782,017.00 of which will be used to pay the claims of consumers residing within the Plaintiff States, and $28,217,983.00 of which will be used to pay state agency claims. The injunction also prohibits all of the defendants from entering exclusive active pharmaceutical ingredient ("API") agreements with nonparties, and Mylan will be prohibited from entering agreements with their codefendants that would prohibit them from selling lorazepam or clorazepate. Each defendant also will have to report to the Commission its compliance with this order within ninety days of the date of the Order and annually for the next five years.

United Wisconsin Services filed the first action here against Mylan, Cambrex, and Gyma, *United Wisconsin Services, Inc. v. Mylan Labs., Inc.*, No. 99–1082.[6] The plaintiffs in *United Wisconsin* are third party payors who paid for prescriptions of generic lorazepam and clorazepate filled between January 1, 1998 and December 31, 1999 on behalf of health benefit plan members who reside in twenty states—Arizona, California, the District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, South Dakota, Tennessee, West Virginia, and Wisconsin—that have specific indirect purchaser statutes or case law permitting private parties to sue in such a capacity. On January 25, 2001, third party payors in thirty-one other states—Alaska, Alabama, Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Iowa, Idaho, Illinois, Indiana, Kentucky, Maryland, Missouri, Mississippi, Montana, Nebraska, New Hampshire, Nevada, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Utah, Virginia, Vermont, Washington, and Wyoming—filed the other action before the Court, *Arkansas Carpenters Health and Welfare Fund v. Mylan Labs., Inc.*, No. 01–0159, to effectuate the settlement of the their claims that had been pending in related state court actions.[7]

Pursuant to orders of the Court, the plaintiffs engaged in extensive coordinated pretrial discovery of the defendants, SST, and other nonparty witnesses. This discovery included the review and analysis of thousands of documents and the taking of more than seventy depositions. The plaintiffs also met with counsel for the FTC and Plaintiff States to engage in further cooperative discovery and investigation. And with their consulting expert, the plaintiffs reviewed and analyzed extensive sales data concerning the generic drugs at issue in this case during the relevant period.

In March 2000, the parties began settlement negotiations. They reached an agreement on settlement amounts by July 2000 and completed negotiations on other terms and conditions of settlement in January 2001. The third party payor plaintiffs, the defendants, and SST executed a Stipulation of Settlement ("Settlement Agreement") in each case on January 29, 2001. After a hearing held on February 9, 2001, the Court preliminarily approved both Settlement Agreements and conditionally certified the respective third party payor classes for settlement purposes only.

## II. DISCUSSION

### A. Plaintiff States

The FTC and Plaintiff States moved for final approval of their settlement agreements on November 5, 2001, specifically seeking: (1) final approval of the Mylan Settlement Agreement and the SST Settlement Agreement;[8] (2) final approval of the Plaintiff States' proposed distribution plans; (3) final approval of the payment of the costs of notice and claims administration; (4) final approval of the payment of attorneys' fees and litigation costs; and (5) both a final ruling that certain states have authority to represent consumers and to settle and release their claims, and a final certification of the following class for settlement purposes only:

> All natural person consumers within Plaintiff States where such a class action may be brought, not otherwise represented by the Plaintiff States as *parens patriae*, who purchased generic lorazepam and/or clorazepate sold in the United States from

---

**6.** On February 15, 2000, Blue Cross and Blue Shield of Kansas, Inc. and Group Hospitalization and Medical Services, Inc. d/b/a Carefirst Blue Cross BlueShield, Inc. joined the lawsuit as plaintiffs in an amended complaint.

**7.** Third party payor plaintiffs had originally filed an action on December 23, 1998 in state court in Tennessee, *Middle Tennessee Teamsters Trust Fund v. Mylan Laboratories, Inc.*, No. 98–

3833(II). Another action was filed in February 1999 in state court in New Jersey, *Cement Masons Local Union No. 699 Health and Welfare Fund v. Mylan Laboratories, Inc.*, No. MER–L–000431–99.

**8.** SST also filed a brief supporting final approval of its settlement with the Plaintiff States.

January 1, 1998 through December 31, 1999.

11/5/01 Mot. at 2.

### (1) Final Approval of Settlement Agreements

■ Approval of a proposed class action settlement lies within the discretion of this Court. *In re: Vitamins Antitrust Litig.*, 2001-2 Trade Cas. (CCH) ¶ 73,361, 2001 WL 856290, at *1 (D.D.C. July 19, 2001); *United States v. District of Columbia*, 933 F.Supp. 42, 47 (D.D.C.1996). Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R.Civ.P. 23(e).[9] The Rule 23 requirements are fully consistent with the long-standing judicial attitude favoring class action settlements. *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C.Cir.1993). While the Court should "scrutinize the terms of the settlement carefully," the discretion to reject a settlement is thus "restrained by the 'principle of preference' that encourages settlements." *Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999); *see also United States v. District of Columbia*, 933 F.Supp. at 47 (" 'The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties.' ") (quoting *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir.1983)).

■ There is no single test in this Circuit for determining whether a proposed class action settlement should be approved under Rule 23(e), and the relevant factors may vary depending on the factual circumstances. *Pigford*, 185 F.R.D. at 98 & n. 13 (citing *Thomas v. Albright*, 139 F.3d 227, 231 (D.C.Cir.1998)). Generally, in determining whether a settlement should be approved, courts consider whether the proposed settlement "is fair, reasonable, and adequate under the circumstances and whether the interests of the class as a whole are being served if the litigation is resolved by settlement rather than pursued." *Manual for Complex Litigation (Third)*, § 30.42 at 238 (1995). In making this determination, courts in this Circuit have examined the following factors: (a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel. *See Thomas*, 139 F.3d at 231–33; *Pigford*, 185 F.R.D. at 98–101; *Osher v. SCA Realty I*, 945 F.Supp. 298, 304 (D.D.C.1996); *Stewart v. Rubin*, 948 F.Supp. 1077, 1087 (D.D.C.1996), *aff'd*, 124 F.3d 1309, 1997 WL 369455 (D.C.Cir.1997); *Pray v. Lockheed Corp.*, 644 F.Supp. 1289, 1290 (D.D.C.1986); *In re Nat'l Student Marketing Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974); *see also Moore v. Nat'l Ass'n of Sec. Dealers, Inc.*, 762 F.2d 1093, 1106 (D.C.Cir. 1985). As set forth below, the Court finds the Mylan settlement Agreement and the SST Settlement Agreement fair, reasonable, and adequate, and accordingly will approve both settlements.

#### (a) Arms–Length Negotiations

■ "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotia-

---

9. State laws authorizing the Attorney Generals to bring and settle actions as *parens patriae*, like their federal counterpart, section 4C of the Clayton Act, 15 U.S.C. § 15c(a)(1), set forth no specific standards for approving a proposed settlement. Given the fact that courts generally have utilized the Rule 23 standards when evaluating *parens patriae* actions for settlement purposes under the federal statute, *see, e.g., New York v. Reebok Int'l, Ltd.*, 903 F.Supp. 532 (S.D.N.Y. 1995) ("15 U.S.C. § 15c(c) requires court approval of the settlement of a *parens patriae* antitrust suit, but it does not specify the standards required for approval. Courts generally look to thee standards used in approving class action settlements under Rule 23(e) of the Federal Rules of Civil Procedure."), and the fact that eight states in this action are in fact proceeding under Rule 23, *see infra* p. 387, the Court finds the Rule 23 standards appropriate for evaluating this settlement.

tions between experienced, capable counsel after meaningful discovery.'" *In re: Vitamins,* 2001 WL 856290, *2 (quoting *Manual for Complex Litigation (Third)* § 30.42 (1995)). No one has challenged the FTC's and Plaintiff States' representation to the Court that the settlement before it is the product of extensive arms-length negotiations by experienced counsel, undertaken in good faith after substantial factual investigation and discovery. Indeed, experienced counsel on all sides conducted lengthy and adversarial negotiations, involving numerous face-to-face meetings and telephone conferences, and they exchanged several proposals before reaching the current agreements. The FTC and Plaintiff States further retained experts to aid their evaluation of the potential liability, damages, and fairness of the settlement amounts. *See, e.g.,* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶¶ 4–30 (detailing analyses and opinion that the settlement is fair, reasonable, and adequate). The Court thus finds that the settlements were ultimately reached through arms-length negotiations.

### (b) Terms of Settlement in Relation to Strength of Plaintiffs' Case

Under the Mylan Settlement Agreement, Mylan has agreed to pay $100 million cash in exchange for the release of the claims against it in this matter. Mylan specifically will wire $71,782,017 to a segregated escrow account ("Consumer Fund") to be used for the payment of consumer claims, and it will wire

$28,217,983 to another segregated escrow account ("Agency Account") to be used for the payment of state agency claims. *See* Mylan Settlement Agreement §§ IV.A, VI.A–D. Mylan has further agreed to pay an additional $8 million, which will be wired to another segregated escrow account ("Cost and Fee Account"), to be used for the payment of the Litigating States' attorneys' fees and costs. *See id.* § IV.B.[10]

Under the SST Settlement Agreement, SST agrees to pay a total of $2 million for the release of all claims against it in this action and related actions.[11] Of the $2 million total, $500,000 will be allocated to the Plaintiff States in this case. Specifically, SST will wire $266,250 to a segregated escrow account ("SST Consumer Fund") for the payment of consumer claims, $108,750 to a segregated escrow account ("SST Agency Account") for the payment of state agency claims, and $125,000 to a segregated escrow account ("SST Cost and Fee Account") for the payment of attorneys' fees and costs. *See* SST Settlement Agreement § III.A–B.

The FTC initially prayed for disgorgement of $120 million in its complaint, and the $100 million that will be recovered through this settlement represents over 80% of that amount. The Plaintiff States' expert estimated total cash damages to consumer purchasers during the monopolization and price-fixing conspiracy, in terms of overcharges, of approximately $111 million, *see* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶ 11,[12] and the settlement provides

---

**10.** Together, the Agency Account and the Cost and Fee Account comprise the "State Fund." Mylan Settlement Agreement § I.AA.

**11.** Upon final approval of all settlements, the $2 million will be allocated as follows: (1) $500,000 will go to the settlement in this action; (2) $400,000 will go to the settlements in *United Wisconsin* and *Arkansas Carpenters,* discussed below; (3) $500,000 will go the settlement in *Advocate Health Care v. Mylan Labs., Inc.,* 202 F.R.D. 12; (4) $100,000 will go to the settlement in the *Generic Drug Antitrust Cases: Mylan Generic Drug Antitrust Pharmacy,* Judicial Counsel Coordination Proceeding No. 4075 ("*Galloway* action") (pending in the Superior Court of the State of California for the County of San Francisco); and (5) $500,000 will be divided among the various settlements with up to half of it going toward the notice costs in SST's settlement with

the direct purchasers in the *Advocate* action and the remainder going in three equal parts to the settlement funds in this action, the *Galloway* action, and the *Advocate* action. *See* SST Settlement Agreement § III.A.

**12.** The damages estimated by the Plaintiff States' expert are based on the actual overcharge paid by consumers. *See* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶¶ 6–9. Although consumers could potentially recover *treble* damages, the standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages. *In re Ampicillin Antitrust Litig.,* 82 F.R.D. 652, 654 (D.D.C. 1979) ("The recovery of actual single damages must be the basis for the Court's assessment of monetary recovery in an antitrust settlement.") (citing *Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974)). Moreover, many states do not permit

$71,782,017 to consumers who purchased the drugs during the relevant time period, which represents 65% of all estimated consumer damages.[13] The fact that this settlement amount is less than the total estimated damages is not surprising and ultimately does not render the terms of the settlement unfair, unreasonable, or inadequate in the Court's opinion, as several additional factors should be taken into consideration. Continued litigation of these lawsuits would undoubtedly require substantial additional pretrial preparation and expense, as the defendants have denied all liability. Such preparation would likely involve dozens of witnesses, including several experts, and thousands of pages of documents. Further litigation also entails substantial risks; given the defendants' denial of liability, monetary recovery certainly cannot be assumed. Moreover, the defendants have argued that even if they are liable, they can be held responsible only for price increases charged by manufacturers to wholesalers, not for retail price increases, upon which the expert predicated his $111 million estimate. The defendants have further contended that if liable, they can be held responsible only for damages resulting for the time period ending with the termination of the alleged illegal supply agreements, rather than the conclusion of 1999 as used in the expert's estimate. Also, the expert's estimate accounts for the damages suffered in all fifty states and the District of Columbia, yet it is less than certain that all states could have otherwise sought monetary damages, due to the lack of *Illinois Brick* repealers. All of these factors would operate to reduce the total potentially recoverable damages in this case. *See* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶¶ 12–18. Finally, counsel has represented to the Court that based on the number of claimants, which is less than the total number of consumers allegedly damaged, the claimants are expected to receive reimbursement for the full amount of their damages. *See* 11/5/01 Mot. at 14–15; 11/29/01 Tr. at 20–21.[14] After considering all of these factors and thoroughly reviewing the representations of counsel and the report of Plaintiff States' expert, *see* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶¶ 5–18, the Court finds the terms of the settlement fair, reasonable, and adequate when juxtaposed to the strength of the plaintiffs' case.

### (c) Status of the Litigation at the Time of Settlement

Early settlement of these types of cases is encouraged. *See, e.g., In re Vitamins Antitrust Litig.*, 1999–2 Trade Cas. (CCH) ¶ 72,726, 1999 WL 1335318, *4 (D.D.C. Nov.23, 1999) ("The pursuit of early settlement is a tactic that merits encouragement; it is entirely appropriate to reward expeditious and efficient resolution of disputes.") (citing *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F.Supp. 148, 151 (S.D.Ohio 1986), and *Muchnick v. First Fed. Sav. & Loan Ass'n of Philadelphia*, 1986 WL 10791, at *3 (E.D.Pa. Sept.30, 1986)). Courts thus consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-á-vis the probability of success and range of recovery. *See, e.g., Ressler v. Jacobson*, 822 F.Supp. 1551, 1554–55 (M.D.Fla.1992) (stating that "[t]he law is clear that early settlements are

---

the recovery of treble damages, and in any event, the recovery of treble damages is far from certain in light of the considerations detailed below.

13. The expert additionally estimated Medicaid damages in the amount of $59.5 million, and as noted above, the Plaintiff States' government agencies will receive $28,217,983. *See* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶ 11.

14. As stated by counsel for the Plaintiff States:
We feel that we can fully pay—and this is based on our expert's analysis and based on the average claim that we think is the actual amount of the claim that's going to be paid—

we feel that we can pay up to 250,000 claims at full damage and still have sufficient money to pay all the claims at this point in time. At this point in time we have 244,000 claims, 244,820. Now, these claims have not been verified, and some of them may not be valid, some of them may have been fully reimbursed by insurance of some other things, but those are the total number of claims that we have.... At the present time, Your Honor, I mentioned this 244,820 potential claims. We expect to pay those at 100 percent of the calculated damages.
11/29/01 Tr. at 20–21.

to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations" and concluding that "the plaintiffs [had] conducted sufficient discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation") (citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981), and *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir.1977)); *Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C.1981) ("In evaluating the fairness and adequacy of a settlement, it is important to consider whether the settlement was reached after extensive factual development, so that counsel on both sides would have had information sufficient to make a reasonable assessment of their risks of litigation.").

The Court is convinced that the Plaintiff States had sufficient information to adequately assess the risks of this litigation at the time of settlement. Within a few months of the price increases by Mylan, the FTC and Plaintiff States began an investigation, which included subpoenas and hearings conducted by the FTC. After filing lawsuits, they conducted extensive discovery, which included interviewing and deposing over 100 potential witnesses and reviewing thousands of documents. Over the nearly three-year duration of this litigation, the parties obtained a significant amount of information for adequately evaluating the merits of the claims and potential defenses. By entering a settlement agreement prior to summary judgment motions, moreover, the parties avoided significant expense and guaranteed a cash recovery. The Court therefore concludes that the parties had adequate information at the time they entered their settlement agreements.

### (d) Reaction of Class

The Court finds that the settlement group's reaction to this settlement has been overwhelmingly positive and supports approval. After notice was nationally disseminated through newspapers, magazines, television, the Internet, point-of-sale displays at over 55,000 pharmacies, and direct mailings to over 1 million consumers, only nine consumers submitted objections, 2,351 opted out, and approximately 244,820 have submitted claims for refunds. *See* 11/5/01 Mot. at 18; Affidavit of Jeffrey D. Dahl, 11/5/01 Mot., Tab 2 ¶¶ 18–19; 11/29/01 Tr. at 20–21.

The existence of a relatively few objections certainly counsels in favor of approval, *see, e.g., New York v. Keds Corp.*, 1994–1 Trad Cas. (CCH) ¶ 70,549, 1994 WL 97201, at *2 (S.D.N.Y. Mar.21, 1994) ("Given th[e] sales volume, the paucity of objections and statements of preference revealed by the record militates in favor of the settlements...."),[15] and after reviewing each one of them, the Court can find no impediment to approval. While the Court appreciates the objections, several of them can be dispensed with expeditiously. Ms. Dorothy Bran filed an objection stating merely that she "object[s] to the settlement," and Ms. Verna Parks similarly objected to class actions generally. Without significant elaboration on their positions, needless to say, such broad statements are of little aid to the Court in determining whether these settlements are fair, adequate, and reasonable. Messrs. W.C. Roehl and Herbert Goldman objected to the settlements because the retail cost of drugs is the same today. As a general matter, their point is well taken. But no illegal conduct by retail drug stores was alleged in this lawsuit. It does not, therefore, affect retailers, only generic manufacturers. Mr. Kenneth O'Mara objected to the settlements out of a fear that there would be a lack of refunds for variable co-pay purchases of the drugs. But as the FTC and Plaintiff States point out, consumers with variable co-pays are eligible to receive reimbursement and with valid claims will recover

---

**15.** The Court also finds no reason to disapprove the settlement stemming from the 2,351 opt-outs. This number is relatively low, representing a mere 0.2% of the 1,281,128 recipients of notice (0.2%) or approximately 1% of the 244,820 claimants. *Cf., e.g., Pigford v. Glickman*, 185 F.R.D. 82, 102 (D.D.C.1999) (finding 5% to be a "low rate of opt-outs" when 85 farmer class members elected to opt out of the class after 1686 completed claim packages). The number more likely reflects the sufficiency and ultimate success of the notice more than some general dissatisfaction with the settlement, which is evidenced by the relatively low number of opt-outs and the relatively low number of objections filed.

the same percentage as consumers who paid cash. *See infra* note 18. Finally, Ms. Toba Olson, represented by counsel Lawrence W. Schonbrun, filed a notice of her desire "to reserve her right to appear for the purpose of speaking in favor of class counsel's request for an attorneys' fee award of $8,125,000 in the instant litigation," but also expressed confusion about the meaning "Related Litigation" and thus objected to the $4 million to be allocated to Co–Lead Counsel, until she could better understand where the money would be spent. Counsel for the plaintiffs thoroughly explained these fees at the fairness hearing, and Ms. Olson did not appear to contest their representations or elaborate upon her objections. The Court is satisfied that the fees are reasonable. *See infra* pp. 384–85.

Several more substantial, yet unavailing, objections were filed by Ms. Cathy Shirley, Mr. Ronald Weintraub, and Ms. Lillie Mae Boone. They objected to the Mylan settlement on the bases that the published notice is deficient as it does not inform class members of the size of the class and provides ambiguous information about the value of the settlement benefits, the claim form requirements pose an undue burden on class members, the settlement amount is inadequate considering the allegations of Mylan's pricing policies, and the proposed distribution plan is unfair because it allows for *cy pres* distribution. However, there is no requirement that the class size be specified in the notice, *see, e.g., Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1359, 1364 (4th Cir.1987) ("[T]he right to adequate notice simply requires that the proposed form of notification be reasonably certain to inform those affected."), and the objectors fail to explain how omitting the class size otherwise affected the adequacy of the notice. The objectors' contentions about ambiguity in the value of the settlement are incredible in light of the fact that the notice explains that the defendants will pay $100 in cash for full and final settlement of legal claims and that $71 million of that amount has been deposited for consumer distribution, notice,

and claims administration costs, and that $28 million has been set aside to reimburse state agencies. The Court also has significant difficulty understanding how the claim form—which required claimants only to write down their name, address, date of birth, social security number, answer five "yes or no" questions in order to help them assess their eligibility, sign, date, attach proof of purchases, and drop the claim in the mail in the postage prepaid envelope provided—is too burdensome.[16] As discussed in the preceding section, the objectors' claim concerning the inadequacy of the settlement amount is unavailing, as the terms of the settlement are fair, reasonable, and adequate when juxtaposed to the strength of the plaintiffs' case. *See Thomas v. Albright*, 139 F.3d 227, 234 (D.C.Cir.1998) ("The court should not reject a settlement merely because individual class members complain that they would have received more had they prevailed after a trial."). Finally, counsel for the Plaintiff States satisfactorily explained at the fairness hearing that the *cy pres* distribution will take place only in the event that funds still remain after payment of all consumer claims, and if it is utilized, the money cannot be sent to a charity, but must be used to benefit consumers of these types of purchases, such as at hospice centers. *See* 11/29/01 Tr. at 52–53; Consumer Distribution Plan, 11/5/01 Mot., Tab 3 at 3; *see also infra* p. 20. The Court sees no fatal flaw with such a plan.

Finally, Mr. Weintraub, through his counsel Edward Cochran, raised two additional objections for the first time at the fairness hearing. *See* 11/29/01 Tr. at 7, 31–32, 43–49. He first objects to paying the eighteen Joining States $1 million. He believes, based on the Plaintiff States' expert report concerning the damages calculation and allocation of the settlement fund, *see* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶¶ 19–28, that the $1 million payment to the Joining States unfairly diminishes the consumer fund by $720,000, because that would be the percentage share (that is, approximately seventy-two percent) otherwise available for con-

---

**16.** Consumers who received notice and waiver materials directly from the pharmacies did not have to take even these steps.

sumer claims. *See* 11/29/01 Tr. at 44–45, 54–55. But as explained by the Plaintiff States at the fairness hearing, the $1 million payment to the Joining States was a necessary component for the settlement; the Litigating States were required to exert their best effort to bring in the eighteen Joining States, and the $1 million offer for those states' agency claims was the inducement that brought them in and completed the settlement. *See* 11/29/01 Tr. at 49–51, 82–83. The record supports the Litigating States' position on this issue, and the expert's report is clear in the calculations, indicating that the Litigating States would receive $27.2 million with the Joining States receiving $1 million. The Court therefore does not find the settlement unfair, unreasonable, or inadequate upon Mr. Weintraub's first objection.

Mr. Weintraub's second objection is that the expert excluded percentage co-pays from all his calculations of damages. The problem with this exclusion, he contends, is not that the consumers with percentage co-pays will not be paid, but that the damages calculation is undervalued. *See id.* at 45–47, 54–55.[17] The Court appreciates the point raised by Mr. Weintraub, but finds it insufficient to compel a conclusion that the settlement reached is unfair, unreasonable, or inadequate. The Plaintiff States' expert excluded percentage co-payment policies from the damages calculation only after considering them and specifically opining that "the impact of this group on an assessment of the reasonableness of the settlement is *de minimis*." Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶ 9 n. 3. He based this conclusion on a survey of insurance agencies conducted by the Plaintiff States, which revealed that the majority of the agencies do not offer percentage co-payment plans, and of those that do, all but one claim less than one percent of their customers has percentage co-payment plans. Even assuming a one-percent population of co-pays, the expert estimated that the damages for this group is only 0.2% of the estimated damages to third-party payers. *Id.* The Court finds his con-

clusion that such damages are *de minimis* for the purposes of evaluating the fairness of the settlement reasonable. The damages analysis conducted by the expert is not an exact science; as he details in his report, many assumptions and mitigating factors must be taken into account in evaluating the fairness of the settlement amount in light of other concerns such as the risks of litigation. *See id.* ¶¶ 6–10, 12–18. For all these reasons, therefore, the Court ultimately concludes that the reaction of the class favors final approval.

### (e) Opinion of Experienced Counsel

Counsel for the FTC, Plaintiff States, and the defendants have considerable expertise in complex antitrust and class action litigation. Opinion of experienced and informed should be afforded substantial consideration, *see, e.g., New York v. Reebok Int'l. Ltd.*, 903 F.Supp. 532 (S.D.N.Y.1995), and particularly here, the Court may place greater weight on such opinion in addressing a settlement negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson*, 497 F.Supp. 824, 830 (S.D.N.Y. 1980) ("[T]he participation in the negotiations resulting in the proposals by a government agency committed to the protection of the public interest and its endorsement of the agreement are additional factors which weigh heavily on the side of approval of the settlement."); *see In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y.2000) ("Moreover, the participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected."). Given counsel's experience, the extensive discovery and lengthy arms-length negotiations conducted in this case, and the information known to counsel at the time they reach the settlement agreements, the Court will credit counsel's opinion that these settlements are fair, reasonable, and adequate.

### (2) Final Approval of Plaintiff States' Distribution Plans

The Plaintiff States have proposed two distribution plans, which the Court will also

---

17. He specifically points out that if consumers with percentage co-pays occupy one percent of the market, that represents $1 million of the $100 million settlement. He also speculates

"that the percentage co-pay may, indeed, be significantly larger than one percent of the market." 11/29/01 Tr. at 46.

approve. Under the Consumer Distribution Plan, $66,782,017 from the Mylan Settlement Agreement and $266,250 from the SST Settlement Agreement will be available for compensating consumer claims. *See* Consumer Distribution Plan, 11/5/01 Mot., Tab 3 at 1, 4.[18] A consumer claims procedure is being administered by Rust Consulting, under which submitted claim forms are examined together with supporting purchase documentation, and when incomplete forms are received, a request for additional information is mailed to the claimant. *See id.* After final validation of all claims, Rust Consulting will prepare a Monetary Distribution Report for the Court's review. *See id.;* Affidavit of Jeffrey D. Dahl, 11/5/01 Mot., Tab 2 ¶¶ 25. If the Court grants approval of the Distribution Order, Rust Consulting will distribute the settlement award to the consumers. If monies remain after that distribution, the Plaintiff States will employ *cy pres* distribution among the thirty-three Litigating States, based on each of the states' respective percentages of the estimated consumer damages, and each Attorney General will distribute its share to the State, a political subdivision thereof, and/or a charitable organization, with the express condition that "the funds be used in a manner reasonably targeted to specifically benefit the health care needs of a substantial number of the persons injured by the increased prices of lorazepam and/or clorazepate. Consumer Distribution Plan, 11/5/01 Mot., Tab 3 at 3; 11/29/01 Tr. at 52–53.

Under the Government Distribution Plan, $28,217,983 from the Mylan Settlement Agreement and $108,750 from the SST Settlement Agreement will be available for all state agency compensation. The eighteen Joining States will receive a total of $1 million. Each Joining State will receive a base amount of $10,000, with the remaining $820,000 apportioned among the Joining States on the basis of each state's percentage of the total estimated governmental dam-

ages. The remaining $27 million will be allocated to the thirty-three Litigating States based on the respective damages to each state's agencies. Ninety-five percent of the total amount (that is, approximately $25 million) will be allocated as a share of total estimated Medicaid damages to each state's agencies. The other five percent (that is, approximately $1,300,000) will be allocated to non-Medicaid-related damages based on state population. Finally, the interest generated from the fund will be distributed to all the states as a proportion of Medicaid damages. *See* Government Distribution Plan, 11/5/01 Mot., Tab 4 at 1–3.

As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate. *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982). The overall distribution between the consumers and state agencies has been structured to allocate money in equal proportion to their respective estimated harm. *See* Affidavit of Laurits R. Christensen, 11/5/01 Mot., Tab 5 ¶ 22. Settlement distributions, such as this one, that thus apportion funds have been repeatedly deemed fair and reasonable. *See, e.g., Beecher v. Able*, 575 F.2d 1010, 1013–14 (2d Cir.1978); *In re Chicken*, 669 F.2d at 240–41. And here, the Consumer Distribution Plan is manifestly fair and adequate because it will likely reimburse consumers in the full amount of their estimated damages. In the unexpected event that the fund is insufficient to fully cover all claims, each claimant's recovery will be ratably reduced based on the ratio of the settlement amount to the total amount of consumer claims, which is a reasonable approach.

The Court also finds the Government Distribution Plan fair, reasonable, and adequate. Under state law, the Attorney Generals represent their state agencies in all litigation, and may settle and release their agency's claims. Because they are not before the Court under *parens patriae* statutes with respect to their agency's claims, therefore,

---

**18.** Two categories of consumers are eligible for reimbursement. The first are unreimbursed or cash customers, and the second are insured consumers with variable or percentage copayments. Consumers with Medicaid coverage for prescription drugs, or insurance for prescription drugs with a fixed co-pay amount, would not be eligible for refunds, as they suffered no financial harm, but will benefit from the injunctive relief obtained. *See* 11/5/01 Mot. at 31–33; Consumer Distribution Plan, 11/5/01 Mot., Tab 3 at 2–3.

the Court need not approve the Government Distribution Plan. The parties have nonetheless asked for this Court's approval, and the Court finds the plan fair and adequate because it allocates settlement funds among the Litigating States and among the Joining States based on their respective percentages of estimated damages, and the greater monetary fund provided to the Litigating States is premised reasonably upon the greater commitment of resources and risks undertaken by them in this litigation. The Court therefore will approve the distributions plans.

### (3) Final Approval of Payment of Notice Costs and Claims Administration

Plaintiff States used Rust Consulting and Kinsella Communications to provide extensive notice through television, newspaper, and magazine advertisements, an Internet website, toll-free telephone lines, point-of-sale displays at pharmacies, and direct mail to over 1 million individuals. *See* 11/5/01 Mot. at 41–52; Affidavit of Katherine Kinsella, 11/5/01 Mot., Tab 1 ¶¶ 8–20; Affidavit of Jeffrey D. Dahl, 11/5/01 Mot., Tab 2 ¶¶ 7–17, 27–29. After careful review of their extensive efforts, the Court finds that they constitute "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2). The Plaintiff States and Rust Consulting expended significant efforts working with some of the nation's largest pharmacy chains to provide direct mail notice to as many customers as could be reasonably identified. *See* Affidavit of Jeffrey D. Dahl, 11/5/01 Mot., Tab 2 ¶ 11; *see also* 11/29/01 Tr. at 22–23. The Plaintiff States, Rust Consulting, and Kinsella Communications made similar extensive efforts to notify settlement group members who could not be notified directly, by compiling relevant specific demographic statistics, and targeting accordingly the use of media including magazines, newspapers, television, an Internet website, press releases, toll-free telephone lines, and pharmacy point-of-sale displays.[19]

The cost of this notice plan and the claims administration is estimated at $8,250,000. *See* Affidavit of Mitchell L. Gentile, 11/5/01 Mot., Tab 6 ¶¶ 3–10; *see also* Consumer Distribution Plan, 11/5/01 Mot., Tab 3 at 4. This figure exceeds the $5 million originally estimated and preliminarily approved for such costs. The Plaintiff States justify the increased cost estimate by averring two factors that necessitated the increased expense. First, the extensive cooperation provided by the pharmacies in the direct mailing campaign added significant mailing costs and reimbursement expenses incurred by the pharmacies in computer programming to extract qualifying purchase records from pertinent databases. Second, the greater response from the direct notice campaign and from television advertising required additional staff for the claims administrator to field calls, process waivers, pharmacy records, and claim forms, and respond to the unusual amount of correspondence from consumers. *See* 11/5/01 Mot. at 42–43; Affidavit of Jeffrey D. Dahl, 11/5/01 Mot., Tab 2 Ex. XIV. More important to the Court, the Plaintiff States explain that the sum available for distribution to consumers will remain virtually "unaltered" from the amount preliminarily approved, because the estimated $3 million earned in interest on the consumer fun will cover this unexpected increase in expense. 11/5/01 Mot. at 50–51; *see* 11/29/01 Tr. at 27. And to the Plaintiff States' credit, the number of consumers submitting claims for refunds was increased nearly ten-fold over that which was anticipated at the time of preliminary approval. Overall, the Court finds the cost of such extensive notice efforts, which have been well documented in the affidavits filed in conjunction with the motion for final approval, reasonable.

### (4) Final Approval of Attorneys' Fees and Costs

■ Courts have a duty to ensure that claims for attorneys' fees are reasonable.

---

19. The results were impressive when viewed through the final reach and frequency numbers. For example, 96.2% of women fifty-five years or older were reached with an average of 7.0 opportunities to see the notice, 96.5% of women sixty-five years or older were reached with an average of 8.2 opportunities to see the notice, and 93.2% of adults thirty-five years or older were reached with average 5.4 opportunities to see the notice. *See* Affidavit of Katherine Kinsella, 11/5/01 Mot., Tab 1 ¶ 13; *see also* 11/29/01 Tr. at 25–26.

*Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265 (D.C.Cir.1993).[20] The D.C. Circuit has joined other circuits in "concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases." *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C.Cir.1993). Proponents find the percentage-of-recovery method attractive "because it directly aligns the interests of the Class and its counsel for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 431–32 (S.D.N.Y.2001). While fee awards in common fund cases range from fifteen to forty-five percent, the normal range of fee recovery in antitrust suits is twenty to thirty percent of the common fund. *See Swedish Hosp. Corp.,* 1 F.3d at 1271–72; *see also In re Aetna Inc.,* MDL No. 1219, 2001 WL 20928 (E.D.Pa. Jan.4, 2001) (finding thirty percent to constitute a reasonable award); *In re Ampicillin Antitrust Litig.,* 526 F.Supp. 494, 498 (D.D.C.1981) (noting that while the bulk of fee awards in antitrust cases are less than twenty-five percent, several courts have awarded more than forty percent of the settlement fund). In cases regarded as "mega-fund" cases—that is, recoveries of $100 million or more—fees of fifteen percent are common. *See Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 989 (E.D.Tex.2000) (surveying cases decided between 1993 and 1999).

While this Circuit has not yet developed a formal list of factors to be considered in evaluating fee requests under the percentage-of-recovery method, other jurisdictions have delineated factors that courts should consider in evaluating fee requests. For example, the court in *Gunter v. Ridgewood*

*Energy Corp.,* 223 F.3d 190 (3d Cir.2000), set forth several factors including: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." *Id.* at 195 n. 1 (citing *In re Prudential,* 148 F.3d 283, 336–40 (3d Cir.1998); *In re GM Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 819–22 (3d Cir.1995)). And the Tenth Circuit considers what has been called "the twelve *Johnson* factors," namely:

> [T]he time and labor required, the novelty and difficulty of the question presented by the case, the skill requisite to perform the legal service properly, the preclusion of other employment by the attorneys due to acceptance of the case, the customary fee, whether the fee is fixed or contingent, any time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the experience, reputation and ability of the attorneys, the 'undesirability' of the case, the nature and length of the professional relationship with the client, and awards in similar cases.

*Rosenbaum v. MacAllister,* 64 F.3d 1439, 1445 (10th Cir.1995) (listing factors from *Johnson v. Ga. Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974)).

There are two fees and costs petitions before the Court. In the first petition, the Plaintiff States seek approval of up to $8,125,000 in attorneys' fees and costs. Approximately $6.8 million of that figure will go toward attorneys' fees and $1.3 million will be used to reimburse out-of-pocket expenses.[21] Neither Mylan nor SST objects to

**20.** As the D.C. Circuit has explained:
Special problems exist in assessing the reasonableness of fees in a class action suit since class members with low individual stakes in the outcome often do not file objections, and the defendant who contributed to the fund will usually have no interest in how the fund is divided between the plaintiffs and class counsel.

*Swedish Hosp.,* 1 F.3d at 1265.

**21.** Mylan agreed to contribute up to $8 million for fees and costs, and the Plaintiff States now specifically seek $7,985,947.58. SST agreed to contribute $100,000 toward fees and $25,000 toward costs.

the fees and costs submission, *see* Affidavit of Andrew E. Aubertine ¶ 7, 11/5/01 Mot., Tab 7; *see also* 11/29/01 Tr. at 33–34, and the Court finds the request reasonable and will accordingly approve it for the following reasons.

Respecting the attorneys' fees petition, the Plaintiff States have detailed the lodestar approach they used to arrive at the $6.8 million fee figure. *See* Affidavit of Andrew E. Aubertine ¶¶ 9–21, 11/5/01 Mot., Tab 7; *see also* 11/29/01 Tr. at 34–35. They assembled a Fees and Costs Committee that utilized a four-step approach to arrive at a figure of $6.4 million for the hours of the states' attorney and staff time spent in this case up to the point of settlement in August 2000. The Committee collected information concerning the hours worked by attorneys and litigation support personnel, established hourly market rates for various classes of attorneys and litigation support staff based on experience, reduced the time submitted to account for possible inefficiencies and duplication of effort, and applied the relevant hourly rates to the remaining attorney staff hours. *See* Affidavit of Andrew E. Aubertine ¶¶ 10, 13–20, 11/5/01 Mot., Tab 7. The Plaintiff States additionally set aside $400,000 to reimburse the leadership contribution of certain states and to partially reimburse them for over 5,000 hours of attorney and staff time spend since August 2000. *See id.* ¶¶ 12, 21. Viewed as a percentage of the common fund, the reasonableness of the fees sought is clear. The $6.8 million fee figure represents less than seven percent of the settlement fund, which is well within the acceptable range of fee recoveries in antitrust suits in which there is a common fund. *See supra* p. 383 (citing *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F.Supp.2d at 431–32, *In re Aetna Inc.*, MDL No. 1219, 2001 WL 20928, *In re Ampicillin Antitrust Litig.*, 526 F.Supp. at 498, and *Shaw*, 91 F.Supp.2d at 989); *see also, e.g., Bebchick v. Washington Metro. Area Transit*, 805 F.2d 396, 405 (D.C.Cir.1986) (approving as reasonable attorneys' fees totaling twenty-five percent of

common fund); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271–72 (D.C.Cir.1993) (approving as reasonable attorneys' fees totaling twenty percent of common fund). Moreover, the $8 million Mylan contribution toward the $8,125,000 total in fees and costs requested was negotiated separately and is independent of the total common fund. It therefore will not reduce the fund at all if awarded. Affidavit of Andrew E. Aubertine, 11/5/01 Mot., Tab 7 ¶ 8. And even though the $125,000 contribution from SST will be taken from the $500,000 total it will contribute toward settlement of the Plaintiff States' claims, it represents less than a mere 0.125% of the $100,500,000 total settlement amount. For these reasons, the fees sought are even more reasonable, and the Court previously has approved similarly structured fee arrangements. *See, e.g., In re Vitamins Antitrust Litig.*, 2000–1 Trade Cas. (CCH) ¶ 72,862, 2000 WL 1737867, at *2 n. 3 (D.D.C. Mar.31, 2000) ("The separate fund for attorneys fees provides the class with greater certainty as to what each class member would receive from the Settlement, because the amount that class plaintiffs receive is not reduced by the award of attorneys' fees.").

The States have also submitted a detailed accounting of the expenses for which they now seek a reimbursement of approximately $1.3 million. *See* Affidavit of Andrew E. Aubertine ¶¶ 22–26 & Ex. B, 11/5/01 Mot., Tab 7; *see also* 11/29/01 Tr. at 35–36. After careful review of the affidavit detailing the costs, the Court finds that the Plaintiff States reasonably expended the claimed amount on experts' time to prepare liability and damages analyses, data for the experts' analyses supplied by IMS Health, Inc., depositions and transcripts, travel, photocopying and postage, long distance telephone charges, and legal research charges. The Court accordingly finds the costs request reasonable.

In the second attorneys' fees and costs petition, a separate set of plaintiffs, the State Purchaser Plaintiffs, seek approval of $4 million.[22] Mylan has agreed to pay $4 million in

---

22. On April 27, 2001, the Court granted a stipulated motion for limited intervention by named plaintiffs ("State Purchaser Plaintiffs") in several related state court indirect purchaser actions

("State Purchaser Actions"). That order specifically permitted the State Purchaser Plaintiffs to intervene in the Plaintiff States' action for the limited purpose of commenting on the settlement

fees and costs—beyond the $100 million for consumer and state agency claims and the $8 million for the Plaintiff States' fees and costs—to the firms of Zwerling Schachter & Zwerling LLP and Goodkind Labaton Rudoff & Sucharow LLP ("Indirect Purchaser Lead Counsel") on behalf of private counsel who participated in the prosecution and resolution of the State Purchaser Actions.[23] As pointed out by Indirect Purchaser Lead Counsel, the efforts of private counsel for the State Purchaser Actions contributed significantly to the FTC and Plaintiff States' settlement. After today's approval of the FTC/Plaintiff States' settlement, the parties will jointly seek dismissal of the State Purchaser Actions, and private counsel for the State Purchaser Actions will seek no further fees or reimbursement of expenses. *See* 4/16/01 Stipulation of Settlement and Dismissal at 6–7; *see also* 11/29/01 Tr. at 30, 27–41. The $4 million figure is the result of adversarial, arms-length negotiations, and like the $8 million fee for the Plaintiff States, the negotiated figure is independent of the consumer fund, which means that the recovery for consumers will not be diminished if it is awarded. *See* 11/5/01 Mot. at 15, 18–19. Also reminiscent of the $8 million award for the Plaintiff States, the $4 million award is reasonable when viewed as a percentage of the recovery. It represents a mere 5.55% of the $72 million fund for consumer claims. Combined with the Plaintiff States' $8 million, the aggregate award amounts to 13.5% of the fund, which is also well within the acceptable range of fee recoveries in antitrust suits in which there is a common fund.[24] Moreover, the reasonableness of the requested amount is confirmed when cross-checked with the lodestar approach. Counsel has submitted affidavits detailing the significant effort exerted on behalf of the indirect purchaser actions related to this petition. Forty-one firms prosecuting the indirect purchaser actions have collectively devoted more than 25,000 hours of professional time amounting to an aggregate lodestar of $8,277,762.73. *See* 11/15/01 Affidavit of Robert S. Schachter ¶ 6. As pointed out by counsel, if this $4 million petition is awarded along with the fees sought in *United Wisconsin* and *Arkansas Carpenters,* discussed below, the resulting multiplier would be less than a modest 1.3. The Court concludes that the fee is reasonable.

The Court additionally finds the costs request reasonable. As detailed in filed affidavits and through representations at the fairness hearing, counsel has demonstrated that they advanced total litigation costs and expenses of $779,148.51 for consulting and retaining experts, reviewing hundreds of thousands of documents, creating and maintaining a comprehensive computer database, and the like. *See* 11/15/01 Affidavit of Robert S. Schachter ¶ 8; *see also* 11/29/01 Tr. at 40. Approximately ten percent of the $4 million sought here will be used to reimburse expenses, and counsel has attributed half of these expenses to the State Purchaser Actions and half to the United Wisconsin

and petitioning for the award of agreed-upon attorneys' fees and costs. As a result of the Plaintiff States' third amended complaint, the State Purchaser Plaintiffs became members of the "Settlement Group," which has agreed to release all state and federal law claims against the defendants, including the claims asserted by the State Purchaser Plaintiffs in their state court consumer class actions.

**23.** Since 1998, a total of 41 law firms have prosecuted indirect purchaser lawsuits against the defendants on an entirely at-risk contingency fee basis. On March 9, 2000, the Court appointed Zwerling Schachter & Zwerling LLP and Goodkind Labaton Rudoff & Sucharow LLP as co-lead counsel to orchestrate and coordinate the efforts of counsel for these indirect purchaser actions. *See generally Manual for Complex Litigation (Third),* § 20.22 (1995). The $4 million will be shared by all these firms. *See* 11/29/01 Tr. at 163, 166–67.

**24.** Even more accurate percentages, perhaps, can be extracted if one accounts for the fact that consumers will receive 100% of the fund that has been designated for their claims. Because of that fact, the attorneys' fees and costs allocated to the Plaintiff States and State Purchaser Plaintiffs can be added to the consumer fund before considering the relative percentages. Viewed through this lens, the total fund would be $81,-812,128—that is, $72,048,267 (for consumer claims) plus $5,763,861 (for Plaintiff States' fees and costs calculated as a proportionate eight-percent share of the consumer fund) plus $4,000,000 (for State Purchaser Plaintiffs' fees and costs). Of that total, $4,000,000 amounts to 4.88% and $5,763,861 amounts to 7.02%, for an aggregate 11.9%.

and Arkansas Carpenters Actions. Accordingly, $389,874.26 will be reimbursed from the $4 million recovered in this request. *See* 11/15/01 Affidavit of Robert S. Schachter ¶ 8; 11/5/01 Mot. at 24 & n. 22; 11/29/01 Tr. at 40. After careful review of the State Purchaser Plaintiffs' attorneys' fees and costs petition, and the affidavits submitted and representations of counsel in support thereof, the Court finds the petition reasonable and will approve it.

### (5) *Parens Patriae* Authority and Class Certification

■ For the purposes of settlement, the states can be divided into two groups. The first is a group of forty-three states that have specific authority to represent consumers and to settle and release their claims pursuant to their respective *parens patriae* (or equitable equivalent) authority. The Court preliminarily found that they had such authority on April 27, 2001. Those states now seek a final ruling that each state has authority to represent consumers and to settle and release their claims. No one has challenged such authority, and the Court finds that they have been granted such authority. Fourteen of these states—California, Colorado, Delaware, the District of Columbia, Hawaii, Idaho, Massachusetts, Nevada, Ohio, Oregon, Rhode Island, South Dakota, Utah, and West Virginia—have expressly conferred *parens patriae* authority. *See* Cal.Bus. & Prof.Code § 16760; Colo.Rev.Stat. § 6–4–111; Del. Code Ann. tit. 6, § 2108; D.C.Code § 28–4507(b); Haw.Rev.Stat. § 480–14(c); Idaho Code § 48–108(2)–(4); Mass.Gen.Laws Ann. ch. 93, § 9; Nev.Rev.Stat. § 598A.160(1); Ohio Rev.Code Ann. § 109.81(A); Or.Rev. Stat. § 646.775; R.I.Gen.Laws § 6–36–12; S.D.Codified Laws §§ 37–1–23 through –32; Utah Code Ann. §§ 76–10–916, 76–10–918; W.Va.Code § 47–18–17. Sixteen states—Alaska, Arizona, Florida, Illinois, Kansas, Maryland, Mississippi, New Hampshire, New York, North Carolina, North Dakota, Pennsylvania, Vermont, Virginia, Wisconsin, and Wyoming—have express statutory authority to represent consumers in a capacity which is the functional equivalent of *parens patriae*. *See* Alaska Stat. §§ 45.50.501(a)–(b), 45.50.580(a)–(b); Ariz.Rev.Stat.Ann. §§ 44–

1407, 44–1412; Ariz. Const. art. XIV. § 15; Fla.Stat.Ann. § 542.27(2); 740 Ill.Comp.Stat. 10/7(2); Kan.Stat.Ann. §§ 50–103(a)(8), 50–148(b); Md.Code Ann., Com.Law § 11–209; Miss.Code Ann. §§ 7–5–1, 75–21–37, 75–21–39, and 75–24–1; N.H.Rev.Stat.Ann. §§ 356:4–a, –b, and –c; N.Y.Exec.Law § 63(12); N.C.Gen.Stat. §§ 114–2(8)(a), 75–9 through –16.1; N.D.Cent.Code § 51–08.1–07; 71 Pa.Cons.Stat.Ann. § 732–204(c); Vt.Stat. Ann. tit. 9, § 2458(b)(2); Va.Code Ann. §§ 59.1–9.15(a)–(d), 59.1–9.17; Wis.Stat.Ann. §§ 133.16, 133.17(1); Wy.Stat. §§ 40–12–105, 40–12–106, and 40–12–107. Thirteen states—Alabama, @Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Montana, New Jersey, New Mexico, Tennessee, Texas, and Washington—have had state and/or federal courts interpret statutory provisions to effectively grant *parens patriae* authority or have determined that their attorney general has such authority under state common law. *See Sanderson v. Blue Cross and Blue Shield of Alabama*, 570 So.2d 675, 684 (Ala.1990); Ky.Rev.Stat.Ann. § 367.200; *Kentucky ex rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705 (Ky.Ct.App.1981); *State v. Bordens, Inc.*, 684 So.2d 1024, 1026 (La.Ct.App.1996); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554, 558 (Me. 1973); Me.Rev.Stat.Ann. tit. 5, § 209; *State v. Lumbermen's Ass'n, Inc.*, 1979–2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703, at *6 (Mich.Cir.Ct. Oct.29, 1979); *Kelley v. Carr*, 442 F.Supp. 346, 356–57 (E.D.Mich.1977); *Kelley v. Sclater*, 40 B.R. 594, 596–97 (Bankr. E.D.Mich.1984); *Humphrey v. Ri–Mel, Inc.*, 417 N.W.2d 102, 112 (Minn.Ct.App.1988); *Minnesota v. Standard Oil Co.*, 568 F.Supp. 556, 563 (D.Minn.1983); Mo.Rev.Stat. §§ 27.060, 416.061; *Clark Oil & Ref. Corp. v. Ashcroft*, 639 S.W.2d 594, 596 (Mo.1982) (*en banc*); Mont.Code Ann. § 30–14–222(1); *State ex rel. Olsen v. Public Serv. Comm'n*, 129 Mont. 106, 283 P.2d 594, 599 (1955); N.J.Stat.Ann. §§ 56:9–12.b; *O'Regan v. Schermerhorn*, 25 N.J. Misc. 1, 50 A.2d 10, 15 (Sup.Ct.1946); *Hyland v. Kirkman*, 157 N.J.Super. 565, 385 A.2d 284, 290 (Super.Ct.Ch.Div.1978); N.M.Stat.Ann. §§ 8–5–2, 57–1–7, and 57–1–8; *New Mexico v. Scott & Fetzer Co.*, 1981–2 Trade Cas.

(CCH) ¶ 164,439, 1981 WL 2167, at *1 (D.N.M. Dec.22, 1981); Tenn.Code Ann. § 8–6–109(b)(1); *State v. Heath*, 806 S.W.2d 535, 537 (Tenn.Ct.App.1990); *State ex rel. Inman v. Brock*, 622 S.W.2d 36, 41 (Tenn. 1981); Tex.Bus & Com.Code Ann. §§ 15.04, 15.20; *Abbott Labs. v. Segura*, 907 S.W.2d 503, 505 (Tex.1995); *Texas v. Scott & Fetzer Co.*, 709 F.2d 1024, 1027 (5th Cir.1983); *Bachynsky v. State*, 747 S.W.2d 868, 870 (Tex.App.1988); Wash.Rev. Code § 19.86.080; *State v. Taylor*, 58 Wash.2d 252, 255–56, 362 P.2d 247 (1961); *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir.1991), *rev'd on other grounds sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993).

The second set is comprised of eight states—Arkansas, Connecticut, Georgia, Indiana, Iowa, Nebraska, Oklahoma, and South Carolina—that represent their respective citizen-consumers pursuant only to Federal Rule of Civil Procedure 23 and therefore seek certification of a settlement class defined as follows:

> All natural person consumers within Plaintiff States where such a class action may be brought, not otherwise represented by the Plaintiff States as *parens patriae*, who purchased generic lorazepam and/or clorazepate sold in the United States from January 1, 1998 through December 31, 1999.

The Court conditionally certified this class on April 27, 2001, and the states now seek final certification for settlement purposes only.[25]

A settlement class certification must comply with all four prerequisites of Rule 23(a) and one of the three subsections of Rule 23(b). *See Thomas v. Albright*, 139 F.3d 227, 234 (D.C.Cir.1998). Rule 23(a) permits certification only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.Proc. 23(a).

All four requirements of Rule 23(a) are satisfied here. First, even if based only upon the more than 244,820 consumers that have already submitted claims for refunds, the numerosity requirement has been met; this large number clearly renders joinder impracticable. Second, antitrust actions typically present common questions of law and fact, and here, all claims derive from the same set of facts. Third, the state agencies' and consumers' claims are typical because they arose at the same time in the same market and are based on the same theory of damages. Finally, the attorneys generals of the plaintiff states have no conflicting interests with the consumers and agencies they represent, have evidenced a genuine interest in this litigation, and are qualified and experienced. *See, e.g., In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 274 (D.D.C.1972) ("And the Court is persuaded that the states and cities, acting through their attorneys general and chief law officers respectively, are the best representatives of the consumers residing within their jurisdictions.").

With respect to Rule 23(b), the plaintiffs have moved for certification under both Rule 23(b)(1) and Rule 23(b)(3). Rule 23(b)(1) requires that "separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct of the party opposing the class." Fed.R.Civ.P. 23(b)(1). As the Plaintiff States point out, there are thousands of class members located in every jurisdiction in the country, and the claims are factually and legally complex. Thus, the Court finds a great risk of inconsistent adjudications if the class is not certified. Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting

---

**25.** In addition to the eight noted states, the attorneys general of Alaska, California, Florida, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Texas, Utah, Virginia, Wisconsin, and Wyoming also seek certification under Federal Rule of Civil Procedure 23 as well as their respective state's *parens patriae* or equivalent authority.

only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The Rule further provides that matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[26]

*Id.* The alleged conspiracy in this case was a monopolization of the markets for generic lorazepam and clorazepate and price fixing. Many questions of law and fact concerning these antitrust violations predominate over individual class member factual or legal issues. As the states have indicated, the calculation of individual damages based upon the volume of prescriptions purchased appears to be the only issue specific to each individual class member, and it is unlikely that individual consumers would take on the time and expense of prosecuting the conspiracy. Rather, the attorney generals of the respective states working together as they have done in reaching this settlement on behalf of their consumers and agencies appear best suited to efficiently and effectively prosecute this action. In addition, judicial economy and convenience to the defendants weigh in favor of class certification and against proceeding with thousands of individual actions.

For these reasons, the Court will certify the class for settlement purposes.

**B. Third Party Payors**

■ On November 15, 2001, the third party payor plaintiffs moved for final approval of the proposed settlements in *United Wisconsin* and *Arkansas Carpenters,* and they petitioned the Court for attorneys' fees and costs.[27] In their motions, the plaintiffs specifically seek: (1) final approval of the Settlement Agreements; (2) final approval of the Allocation and Distribution Plans; (3) final approval of petition for attorneys' fees, litigation expenses, and incentive awards; and (4) certification of their respective classes for settlement purposes only.

**(1) Final Approval of Settlement Agreements[28]**

**(a) Arms–Length Negotiations**

Settlement negotiations in both cases began in March 2000 and intensified during June and July 2000. Agreements with Mylan were reached in July 2000 after the FTC agreed to settle its disgorgement claim with Mylan for $100 million, which would be allocated for recovery for the Plaintiff States' agency and *parens patriae* claims. Shortly thereafter, the plaintiffs also reached settlement agreements with SST. The parties then engaged in an additional six months of negotiations to draft the various aspects of the settlement agreements. With respect to those negotiations, the parties have represented to the Court through filed affidavits and declarations and representations at the fairness hearing that all decisions concerning offers, counter-offers, and acceptance and re-

**26.** The Supreme Court has stated, however, that "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, ... for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see Thomas v. Albright,* 139 F.3d 227, 234 (D.C.Cir.1998).

**27.** The amounts to be paid by SST under both settlements were subject to a reservation of rights by SST to terminate its obligation under the settlement in the event that third party payors that opt out of the United Wisconsin Class paid at least $11,669,008 in the twenty United

Wisconsin states for the drugs in the class period. Under the November 19, 2001 Stipulation and Order, the parties agreed to extend the original deadline for SST to exercise its right to terminate to November 21, 2001. However, the parties reported at the hearing that SST did not exercise that right and were ready to move forward with the settlement. *See* 11/29/01 Tr. at 60, 98–99, 168.

**28.** The legal standards for final approval and for each of the factors discussed below have been discussed at length above and thus will not be reiterated here.

jection of settlement offers were made by the respective named plaintiffs through their regularly retained and in-house counsel, in consultation with the respective Third Party Payor Lead Class Counsel. *See* 11/14/01 Affidavit of Richard W. Cohen ¶¶ 24–31; Declaration of Elizabeth Bartlett ¶¶ 8–10, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 1; Declaration of Carol Nakhuda, Esq. ¶¶ 6–7, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 3; Declaration of Mary Elizabeth Giblin, Esq. ¶ 3, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 4; Declaration of William H. Pitsenberger, Esq. ¶¶ 7–9, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 5; 11/13/01 Affidavit of Joe R. Whatley, Jr. ¶¶ 6–7. Following the recommended structure set forth in the *Manual for Complex Litigation (Third)*, § 20.22 at 26–31 (1995), the Indirect Purchaser Lead Counsel, in consultation with the respective Third Party Payor Lead Class Counsel, communicated settlement offers to, and received settlement offers from, counsel for the defendants and SST. Communications to and from the respective plaintiffs were conducted solely by their Third Party Payor Lead Counsel. *See* 11/29/01 Tr. at 37–39, 42–43, 59, 62, 64–70, 162–65; *see also* 11/14/01 Affidavit of Richard W. Cohen ¶¶ 24–31; Declaration of Elizabeth Bartlett ¶¶ 8–10, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 1; Declaration of Carol Nakhuda, Esq. ¶¶ 6–7, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 3; Declaration of Mary Elizabeth Giblin, Esq. ¶ 3, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 4; Declaration of William H. Pitsenberger, Esq. ¶¶ 7–9, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 5; Affidavit of Joe R. Whatley, Jr. ¶¶ 6–7.

Two sets of objectors—the objecting Individually Represented Companies ("IRCs")[29] and UnitedHealth Group ("UnitedHealth")—have challenged the fairness of the settlement, claiming "serious conflict of interest issues affecting the proposed settlements." 11/29/01 Tr. at 115, 121. They concede that the structure set up, and process of negotiation followed, by Indirect Purchaser Lead Counsel, the respective Third Party Payor Lead Class Counsel, and the respective in-house counsel for the various named plaintiff class representatives is a "fine structure if it does what it's supposed to do":

> There are two competing groups fundamentally here. On the one hand consumers, as represented by the Attorneys General and the Federal Trade Commission, and on the other hand third-party payors. There is a limited pot of money available. Both want to assert their best claims to that pot of money. . . . Further, in the third-party payor case, Mr. Cohen brought [the United Wisconsin] case on behalf of only certain third-party payors. . . . Nevertheless, there is another . . . group of third-party payors representing the rest of the universe, the Arkansas Carpenters class. Again, in the third-party payor pool of money. As Mr. Persky and Mr. Cohen explained, they erected a structure that at least outwardly suggests that it might solve the problem. Mr. Persky and Mr. Schachter would represent kind of the world—I suppose—consumers and all third-party payors; Mr. Cohen and Mr. McCallister would represent just the United Wisconsin group, and the Whatley firm would represent just the Arkansas Carpenters firm. Your Honor, I have no quibbles with that structure. In fact, it's a fine structure if it does what it's supposed to do. And for perhaps much of the case, it did do what it was supposed to do.

11/29/01 Tr. at 125–26. But they ultimately see a conflict "when there are settlement negotiations":

> Blue Shield of California, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Michigan, Conseco Companies, Excellus Health Plan, Inc., The Guardian Life Insurance Co., Humana, Inc., Independence Blue Cross, Kaiser Foundation Health Plan, Inc., Mutual of Omaha Insurance Co., Trigon Blue Cross and Blue Shield, and Trustmark Insurance Co. *See* 11/29/01 Tr. at 84–86, 114.

---

29. Six of the original 17 IRCs—Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Texas (collectively Health Care Services Corp.), Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Federated Mutual Insurance Co.—opted out and therefore do not join the objections to the settlement. The Objecting IRCs are thus comprised of

What would ideally happen ... is that unconflicted loyal counsel go in and make their case to the defendants. Defendants, here's our case, here's what were doing, here are our damages, here is the law, here are our claims, here's what we're entitled to.... [B]ut it appears form their discovery that third-party payor class counsel didn't do that. They didn't meet with the defendants, they didn't negotiate with the defendants, and that obviously is critical. Mr. Persky representing the world was not in a position to make the case of third-party payors to the defendants and certainly was not in a position to make the case of the Arkansas Carpenters claimants versus the United Wisconsin claimants. Limited pot of money and divergent claims to it.

*Id.* at 127; *see also, e.g.,* 11/29/01 Tr. at 124 ("Now, class counsel, I think, is suggesting to the Court that by sitting and waiting by the phones for Mr. Persky to communicate settlement offers, that they have fulfilled their role."). In other words, they object because Indirect Purchaser Lead Counsel, rather than the respective Third Party Payor Lead Class Counsel, met with the defendants and SST. This purported conflict tainted the fairness of the settlement, according to these objectors, in that the negotiations yielded insufficient settlement funds, unfair distribution between classes, and unreasonable fee arrangements.

After thoroughly reviewing the affidavits, declarations, and representations of counsel at the fairness hearing, the Court finds the objectors' alleged conflict of interest, while perhaps theoretically plausible, wholly unsubstantiated by the record. It is true that Indirect Purchaser Lead Counsel met with the defendants and SST. But the objectors have ignored all reality by implying that the respective Third Party Payor Lead Class Counsel passively allowed Indirect Purchaser Lead Counsel to negotiate on their behalf. The evidence properly before the Court paints a starkly different picture. As Third Party Payor Lead Class Counsel for the United Wisconsin plaintiffs described it:

The procedure under which we worked, as Mr. Persky referred to, worked beautifully, and it worked just as contemplated under the manual for complex litigation 3d, Section 28.221 and 222, which contemplates that in cases, centralized cases involving multiple parties and multiple classes with possibly divergent interests, that the Court appoint what's called a designated counsel, which can be further refined to liaison, lead, et cetera. It also contemplates that the designated counsel may be in the best position to, because of its day-to-day contact with the defendants, to actually receive a settlement offer, provided that it understand from the outset a clearly delineated limitation on its authority, and that's what occurred here. Mind you, there were points during the litigation, not simply at the settlement phase, where we did, in a sense, override the liaison counsel. For instance, at one point the defendants propounded discovery concerning, I think it was 21 different drugs, which was not a matter that greatly affected the consumer cases that Mr. Persky and Mr. Schachter were involved in, but did affect the third-party payor classes because it was a considerable amount of discovery being sought on a case that was concerned with two drugs, Lorazepam and Clorazepate. And in that instance I dealt directly with Mr. Miller at Clifford, Chance, Rogers & Wells to refine that discovery request to a manageable one for the thirty-party payors. In our brief and in our affidavits we described how the settlement process in this case worked, which was that Mr. Persky and Mr. Schachter received settlement offers from the defendant—from Mylan, and this occurred after the State AGs and the FTC had settled, which were communicated to me. I then communicated them to Mr. McCallister, who personally represents Kansas Blue Cross, to Ms. Bartlett, who was the in-house counsel at United Wisconsin, and to Ms. Giblin, who was in-house counsel at Care First. I would then confer with them. We would accept, reject, have counteroffers, et cetera. We would communicate that back to Mr. Persky or Mr. Schachter. By the way, not once throughout this case had any lawyers from either the Zwerling or Goodkind firms even met the in-house counsel, the

class representatives. We kept the—we kept the wall—we kept the integrity of the wall throughout this case. However, we did engage in a coordinated prosecution of this case with the plaintiffs in the Arkansas Carpenters case and with the group represented by Mr. Schachter and Mr. Persky with those 13 state cases in the interest of judicial economy, efficiency and in the interest of our personal economy and efficiency, and it worked very well.

11/29/01 Tr. at 66–68. Counsel elaborated:

Given [the financial health of Mylan] and given what we had already discussed with our expert and the IMS data that we had already reviewed, we came up with a reasonable range of settlement for the United Wisconsin case, which was the only case that my clients and I and Mr. McCallister were concerned with. We didn't give that number to Mr. Persky or Mr. Schachter, but we told them if they received any offers concerning our case, that they were to communicate to me, and I glued myself to my chair for the 6th and the 7th of July and also during the 28th and 29th of June, and I instructed the in-house counsel that my clients do the same. And we had many, many hours of back and forth during the course of those days. Now, the objectors complain that I wasn't in the room. Two things. One, we did this the way the manual contemplates. And 2, I wasn't in the room for strategic reasons. We purposely set up this mechanism because it's my experience from 18 years on the defense side and now four years on the plaintiffs' side in class action litigation, that the enemy of settlement is to have a myriad of different plaintiff groups represented by different multiple attorneys sitting around a room and heckling the defendant who wants to know who can I deal with and who can I settle this with and who can I communicate with without having to hear everybody's parochial concerns on every matter. And, in fact, early in the case, Mr. Miller at Rogers–Wells and his partner Mr. Weidner communicated to me that that was the procedure by which they would appreciate any settlement discussions to occur, that they would communicate an offer to Persky and Schachter. Everybody understood that the authority rested with me, with Mr. McCallister and more importantly with our clients who were not your typical class action plaintiffs, who have a nominal interest and perhaps don't even follow the case. The affidavits of Mr. Schachter, Ms. Bartlett ·Mr. Pitsenberger, who is the in-house counsel at Kansas Blue Cross, Ms. Giblin, myself, all attest to the arm's-length nature of the United Wisconsin settlement. We speak here only for the United Wisconsin settlement. We have no doubts concerning the others, but they're outside my bailiwick.

*Id.* at 71–72; *see also id.* at 162–63 ("In terms of procedure, again, Mr. Cohen has described it, and the same procedure applied to [the Arkansas Carpenters case].").[30] The Court can find no fault with this structure and process used by counsel throughout the negotiation process, as counsel for the respective plaintiffs were actively involved and made the key decisions respecting offers, counter-offers, and the acceptance and rejection thereof. *See* 11/14/01 Affidavit of Richard W. Cohen ¶¶ 24–31; Declaration of Elizabeth Bartlett ¶¶ 8–10, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 1; Declaration of Carol Nakhuda, Esq. ¶ 6–7, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 3; Declaration of Mary Elizabeth Giblin, Esq. ¶¶ 3, attached to 11/13/01 Affida-

30. *See also* 11/29/01 Tr. at 157–58 ("The memorandum that went among our counsel before those negotiations occurred was strictly among the United Wisconsin, Kansas, and Care First counsel, Mr. McCallister and myself. We had our own strategy. We sent—Mr. Persky and Mr. Schachter went to those negotiations without our number. They were authorized to convey to us numbers that were presented by Mylan. They did so. We took them up. We kept coming back and saying not enough, not enough. When they go near our number, we still told them not enough. We told them when they were getting warm, and when they hit our number we agreed. And that's how it wen, and that's in evidence. That's not Mr. Garber's speculation."); *id.* at 156–57 ("[A]ll decisions concerning offers, counter-offers, acceptance, rejections in the United Wisconsin case were made by Mr. McCallister, me and the in-house counsel at Wisconsin Kansas and Care First Blue Cross, and that's all of our affidavits and that's in evidence and that's not speculation.").

vit of Hollis L. Salzman, Ex. 4; Declaration of William H. Pitsenberger, Esq. ¶¶ 7–9, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 5; Affidavit of Joe R. Whatley, Jr. ¶¶ 6–7. Ultimately, therefore, the Court finds that both settlements were the products of arm's length negotiations by experienced counsel, undertaken in good faith and after substantial factual investigation and legal analysis.[31]

### (b) Terms of Settlement in Relation to Strength of Plaintiffs' Case

Under the Stipulation of Settlement in *United Wisconsin*, Mylan agrees to pay $25 million, and SST agrees to pay $285,600, into interest-bearing escrow accounts to be distributed after final approval of the settlement. *See* United Wisconsin Settlement Agreement §§ I.MM, III.A.[32] Under the accompanying Allocation and Distribution Plan, the total amount less attorneys' fees and expenses, costs of administration of the settlement, and incentive awards to the plaintiffs ("Net Settlement Amount") will be distributed to members of the United Wisconsin Class that file timely claims. *See* United Wisconsin Allocation and Distribution Plan at 3–4. There are two claim options. Under the first, third party payors that maintained

records of the actual amounts paid or reimbursed for the drugs for persons residing in the United Wisconsin jurisdictions, and can certify the accuracy of that information, will have their claims recognized at 100% of such amounts. Under the second claim option, third party payors whose records enable them to certify only the amounts paid or reimbursed for the drugs for persons residing throughout the United States can estimate the amounts paid or reimbursed for the drugs for persons in the United Wisconsin jurisdictions by multiplying the ratio of their "covered lives"[33] in the United Wisconsin jurisdictions to their covered lives in the United States by the nationwide amount. Those claimants will have their claims recognized at 80% of such estimated amounts. Class members that file timely and valid claims will receive a distribution based on their distribution ratio, which will be determined by dividing the individual claim by all claims. The distribution will be calculated by multiplying the ratio by the Net Settlement Amount. *See id.* at 4.[34]

In *Arkansas Carpenters*, Mylan agrees to pay $10 million, and SST agrees to pay $114,400. *See* Arkansas Carpenters Settlement Agreement §§ I.LL, III.A.[35] The Allo-

---

31. The Court is mystified by the objectors' desire to mediate a way out of the purported conflict. As Mr. Garber articulated the objectors' position:

And I'll submit, Your Honor, that if that happens, there can be a resolution. What I'm not doing here today, Judge, is arguing that the case should be blown up, that we should start back at ground zero. What I'm arguing is that there is a solution.... What I am recommending to the Court is, even before the Court passes on the fairness of the settlement, because I don't want this case to fall apart, that the Court consider directing the parties, including the objectors, to engage in mediation, to do it on a short time schedule, to do it under Court supervision, and to see if we can arrive at a resolution.

11/29/01 Tr. at 132–33. As stated from the bench at the hearing, however, the Court fails to see how mediation—as a means of merely tinkering with the fund allocation and fees—could purge the taint of a true conflict of interest. Rather, if a true conflict existed, it seems to the Court that the entire settlement would be have to be vacated, new counsel would be necessitated, and the case would then proceed to trial or be settled through new agreements.

32. Class counsel reported at the fairness hearing that interest on the escrowed settlement fund is

nearly $500,000, yielding a gross settlement fund of approximately $25,775,000. The administrative expenses total approximately $250,000, with $110,000 spent on notice costs and $140,000 on settlement administration. After the requested fees, expenses, and incentive awards sought, over $21.5 million net will be available for distribution to the class members. *See* 11/29/01 Tr. at 60–61.

33. "Covered Lives" means either the number of: (a) persons covered by a United Wisconsin Class member's prescription drug benefit plans as of January 1, 1999; or (b) the aggregate months of coverage for all persons covered during the Class Period by a United Wisconsin Class member's prescription drug benefit plans. United Wisconsin Allocation and Distribution Plan at 4 n. 1.

34. At the fairness hearing, class counsel estimated an average distribution of $10,000 per claimant. 11/29/01 Tr. at 61.

35. SST's total amount in these cases, $400,000, is a portion of the $2 million that it is paying as part of its global settlement. *See supra* note 11 and accompanying text.

cation and Distribution Plan is essentially identical to the United Wisconsin plan. As in that plan, the total amount less attorneys' fees and expenses, costs of administration of the settlement, and incentive awards to the plaintiffs ("Net Settlement Amount") will be distributed to members of the Arkansas Carpenters Class that file timely claims. *See* Arkansas Carpenters Allocation and Distribution Plan at 3–4. The same two claim options also exist, and class members that file timely and valid claims will receive a distribution based on their distribution ratio multiplied by the Net Settlement Amount. *See id.* at 4.

The plaintiffs correctly note that these settlements ensure recovery of an all cash amount for third party payors, which must be balanced against the continued expense and risks of the lengthy and complex antitrust litigation, especially in this case in which an alleged vertical conspiracy is at issue with Profarmaco and Mylan, for example, at different levels of distribution. Any prospective award from a jury, of course, presupposes survival of motions to dismiss, motions for summary judgment, and successful certification of one or more classes in all of the respective jurisdictions. Even assuming the plaintiffs could surpass such significant hurdles, post-trial motions and appeals would be likely, which would delay and further risk recovery. *See* 11/29/01 Tr. at 73–76. As this Court has previously stated:

> By reaching a large settlement at a relatively early stage in the litigation, plaintiffs avoided significant expense and delay and ensured a guaranteed recovery at a high level. Antitrust price fixing actions are generally complex, expensive, and lengthy. Trial of this matter easily could have lasted months and may not even have started for many years; and any verdict inevitably would have led to an appeal and might well have resulted in appeals by both sides and a possible remand for retrial, thereby further delaying final resolution of this case. These factors weigh in favor of the proposed Settlement.

**36.** The objectors' arguments concerning attorneys' fees are addressed below. *See infra* pp.

*In re: Vitamins Antitrust Litig.*, 2000–1 Trade Cas. (CCH) ¶ 72,862, 2000 WL 1737867, *4 (D.D.C. Mar.31, 2000) (citing *Slomovics v. All for a Dollar, Inc.*, 906 F.Supp. 146, 149 (E.D.N.Y.1995)) ("The potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interest of the Class.").

The plaintiffs highlight the fact that they are indirect purchasers as one of the most significant legal impediments to the successful prosecution of their lawsuit. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (holding that only direct purchasers have standing to assert antitrust injury for the purposes of section 4 of the Clayton Act); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 17–19 (D.D.C.2001). They further cite substantive defenses that have been asserted by the defendants such as the defendants' denial that they proximately caused the alleged antitrust injury and damages when prices were passed down through many levels of distribution, Mylan's denial that it cornered the market as its competitors obtained API from an alternative supplier, and Mylan's challenge to the relevant product market definition. The plaintiffs also acknowledge the significant difficulties involved in contested state-by-state or multi-state class certification proceedings. *See* 11/29/01 Tr. at 76–79. Finally, the plaintiffs justify the lesser recovery for the Arkansas Carpenters Class on the basis that the Arkansas Carpenters jurisdictions do not have state antitrust or consumer protection laws that permit indirect purchaser claims for antitrust violations, thus leaving them with only unjust enrichment claims in relatively unchartered territory. *See* 11/29/01 Tr. at 109–10. When compared to such risks and costs of continued litigation, the plaintiffs contend, the terms of the settlements are fair, reasonable, and adequate.

The IRCs, UnitedHealth, and Health Net, Inc. ("Health Net") filed several sets of objections to the terms of the settlement.[36]

399–400.

The IRCs and UnitedHealth first complain that the settlements generally short-change third party payors, and all three objectors argue that the settlement amounts are unfairly disproportionate to the settlement amounts for other victims. For a benchmark against which to measure the reasonableness of the settlements, the objectors look to a $388 million figure, referenced in the United Wisconsin Settlement Agreement, that represents the amount third party payors paid for both drugs during the relevant two-year time period. They also point to the allegation that Mylan raised prices by 1200% to 4000% and argue that even using the low-end 1200% figure, the overpayment was at least $355 million. The settlements' total of $35 million, contend the objectors, appears to be a mere 9.8% of the damages suffered by third party payors and is thus inadequate. All the objectors additionally argue that this amount is inadequate because it is smaller than the $71 million recovered by the Plaintiff States in the settlement on behalf of consumers.

After carefully reviewing the plaintiffs' expert report, the relevant filed affidavits in evidence, and the representations made by counsel at the hearing, *see* Redacted Report of John Pisarkiewicz, Ph.D., 11/14/01 Affidavit of Bernard Persky, Exs. 4–5; 11/14/01 Affidavit of Richard W. Cohen ¶ 21; 11/29/01 Tr. at 70–71, 73, 101–04, the Court finds no merit in this objection. Although fully litigating the claims through trial could possibly result in a higher recovery, the settlement represents a necessary compromise between inherent risks of doing so and a guaranteed cash recovery. The Court is convinced that the $355 million to $388 million benchmark used by the objectors is inflated and unrealistic. The $388 million figure is the parties' agreed upon estimate of the retail dollar amount of all payments and reimbursements made by the third party payors for all manufacturers' versions of generic lorazepam and clorazepate for the entire class period for persons residing in the United Wisconsin jurisdictions. It does not, therefore, reflect the alleged damages; assuming otherwise would equate damages with 100% of retail

purchases. Moreover, that figure represents the retail sales of all manufacturers, not just Mylan, and this Court has rejected the umbrella damages theory. *FTC v. Mylan Labs.*, 62 F.Supp.2d 25, 38–39, 43 (D.D.C. 1999).[37] Class counsel thus reasonably relied on other, more accurate numbers, in consultation with their retained expert. *See, e.g.,* 11/14/01 Affidavit of Richard W. Cohen ¶¶ 21 ("Between August 1999 and June 2000, I met with and spoke on several occasions with plaintiffs' consulting economist, John Pisarkiewicz, Ph.D, to investigate ranges of damages potentially attainable by United Wisconsin Action class members."). They reviewed Mylan's Annual Report on SEC Form 10-K for the fiscal year ending March 31, 2000 in preparation for settlement negotiations, which reflected significantly decreased sales between 1999 and 2000 resulting in a total sales figure of approximately $255 million during the relevant class period. Mylan's Audited Consolidated Balance Sheet showed that Mylan had aggregate cash and equivalents of approximately $203 million as of March 31, 2000, and Mylan's stock price was at a three-year low. Shortly before it settled with these plaintiffs, Mylan also had entered into a settlement agreement with the FTC and Plaintiff States for $100 million plus $8 million in fees, which significantly diminished the available cash. Mylan contemporaneously had significant exposure to potential liability from the related actions:

> Now we're talking about a relatively small, by pharmaceutical company standards, generic pharmaceutical company that's left with $100 million in cash in total still facing the United Wisconsin action, still facing the Arkansas Carpenters action, still facing the direct purchaser action, which has many of those same prosecution advantages that I stated earl[ier] regarding the State A.G.s and the Federal Trade [C]ommission, a single unitary claim under Section 4 of the Clayton Act.

11/29/01 Tr. at 89–90. The amounts recovered through these settlements represents between approximately fifteen to thirty per-

---

37. During the relevant time period, Mylan only had approximately 45% of the market for lorazepam and 73% of the market for clorazepate.

*See* Redacted Report of John Pisarkiewicz, Ph.D. ¶ 35, 11/14/01 Affidavit of Bernard Persky, Ex. 4.

cent of the plaintiffs' expert's estimated damages.[38] Given the reality of Mylan's financial condition in July 2000, and the significant hurdles to litigating the case to a successful and sustainable verdict, the Court finds the settlement amounts to be reasonable under the circumstances.[39]

In addition, the Court agrees with the plaintiffs' position that comparing these settlements to the FTC and Plaintiff States' settlement is pointless because the FTC already had a disgorgement ruling in its favor before it settled, it was a single litigant with a nationwide claim with no procedural impediment to aggregation such as class certification, all fifty states are involved in that settlement, the State Attorneys General could similarly aggregate their claims under *parens patriae* authority, and they had significant direct purchaser claims under Section 4 of the Clayton Act. The relative plaintiffs had significantly different variables to consider in contemplating settlement.[40]

**38.** Under Dr. Pisarkiewicz's analyses, the estimated retail damages caused by Mylan in the United Wisconsin jurisdictions are $128.9 million, and the estimated disgorgement damages are $80.7 million. *See* Redacted Report of John Pisarkiewicz, Ph.D. ¶¶ 12, 14, 32, 39, 11/14/01 Affidavit of Bernard Persky, Ex. 4. His estimated disgorgement damages in the Arkansas Carpenters jurisdictions are $68.6 million. *See* Redacted Report of John Pisarkiewicz, Ph.D. ¶¶ 8, 26, 11/14/01 Affidavit of Bernard Persky, Ex. 5.

**39.** This conclusion is bolstered by the fact that even the objectors took inconsistent positions with one another on various aspects of the settlements. Despite the fact that they intended to provide a "joint presentation" on their objections at the fairness hearing, 11/29/01 Tr. at 114, counsel for UnitedHealth stated that it "was a very good, substantial result to get the defendants in this case to agree to discharge the amount of money they did," *id.* at 131, and proceeded to opine that the settlement funds only needed to be allocated differently. By stark contrast, counsel for the objecting IRCs proclaimed "that this is not a terrific settlement for third-party payors, it's a terrible settlement for third-party payors" and prayed for disapproval as the settlement funds were woefully inapt. *Id.* at 148. As class counsel succinctly responded, "So much for their coordinated presentation." *Id.* at 155. And despite counsel's opinion on the "terribleness" of the settlements, several of his clients nonetheless opted in. All parties agree that the third party payors, including the IRCs, are sophisticated entities with a significant financial stake in this case. *See, e.g.,* 11/29/01 Tr. at 90–91 ("MR. COHEN: ... Here we have a class of sophisticated, well-heeled third-party payors with substantial financial stakes."); *id.* at 118 ("MR. RHOAD: ... Moreover, our clients are all sophisticated companies, as Mr. Cohen mentioned. They operate in a highly competitive market and they are very much concerned about their business operations."). The fact that many of the IRCs themselves decided to opt-into the settlements therefore lends little credibility to counsel's position on their "terribleness." As the Seventh Circuit recently stated in a similar situation, "Unlike members of the consumer class, [third party payors] are sophisticated purchasers of pharmaceuticals. Their consent to this deal shows that a larger judgment was unlikely." *In re Synthroid Marketing Litig.,* 264 F.3d 712, 717 (7th Cir.2001) (Easterbrook, J.). Such inconsistencies among objectors illustrate the complexities inherent in class action settlement efforts and highlight the reasonableness of the compromise embodied in the settlements reached here.

**40.** In this regard, counsel for the objecting IRCs made several representations to the Court at the fairness hearing that—at a minimum—lack credibility:

MR. SIMMER: ... Now, Mr. Cohen spoke about a pragmatic settlement. The problem with that, Your Honor—and he gave us a parade of horrors about how difficult this case would have been. The problem with that, of course, Your Honor, is that this same parade of horrors is the same horrors that the States and the FTC face in large part in prosecuting their case. They would have faced almost identical defenses in many respects with regard to definition of the relevant market and proof problems, as well.

THE COURT: FTC has the same problem with standing and being the proper plaintiff to bring the case?

MR. SIMMER: I'll concede on that point, Your Honor. FTC did not have a standing issue, but you may remember, as originally filed, the FTC's complaint was on behalf of all injured parties, including corporate injured parties; that the fact that that portion of the settlement got left on the settlement room floor really speaks volumes about the problems with the settlement, we would submit.

MR. GENTILE: And the fact that the FTC—In fact, we called the FTC, Your Honor, to tell them what was happening here. We've been informed by officials of the FTC, and I've been authorized to say to you, that their position is that they have never represented corporate parties, that the disgorgement that they sought under the FTC Act was meant to either pay consumers, which they are doing through the use of the Attorneys General as a mechanism to do that. The other alternative with that money was to turn it over to the Federal Treasury. They declined to do that.

11/29/01 Tr. 136–37, 150–51.

Second, the IRCs, UnitedHealth, and Health Net provide a set of objections concerning the differences between the United Wisconsin and Arkansas Carpenters settlements. UnitedHealth and Health Net object to the unequal amounts allocated to each respective settlement class. This objection, however, ignores *Illinois Brick* and this Court's prior rulings that indirect purchaser damages claims would be recognized only under the laws of states with express rights of action for indirect purchasers. *FTC v. Mylan Labs.*, 62 F.Supp.2d at 43. The respective amounts reflect such rulings in that they account for the weaker claims of the *Arkansas Carpenters* class members in states without *Illinois Brick* repealers and in which they would relying solely on common law unjust enrichment claims.

In a similar vein, the IRCs object that the United Wisconsin settlement improperly excludes Nebraska claims because the state recognizes indirect purchaser claims.[41] This objection, too, lacks merit. A plaintiff is master of its claim, which is equally true of a class plaintiff. Class counsel has averred that none of the United Wisconsin plaintiffs conducts meaningful business in Nebraska, and Nebraska law claims were not included in any complaint they filed. If the objecting IRCs believed they had a meritorious Nebraska claim, they had the option to prosecute it. Their failure to do so does not render this settlement unfair or unreasonable.

The IRCs, UnitedHealth, and Health Net also claim that the determination of class membership in the respective classes by state of residence of beneficiaries is inaccurate, arbitrary, and burdensome. They claim that it is inaccurate because few third party payors track place of residence for all of those covered by their plans (e.g., child away

from college), and in the IRCs' and United-Health's view, the dichotomy is arbitrary and burdensome because participation in the settlement is not tied to the place where prescriptions are filled, as many dependants cross state lines when filling prescriptions. A better approach, they claim, would tie participation in the classes to the location of the pharmacy where prescriptions are filled because third party payors regularly track such information. They ultimately believe that parity should exist between the jurisdictions. Health Net similarly contends that there is no support for the currently devised two-class dichotomy in this case. But in stark contrast to the pharmacy and parity approach proposed by the other objectors, it believes that states like California, where "abundant case law makes clear that indirect purchasers may recover treble damages" and attorneys' fees, should receive a greater share of any recovery. Health Net Mem. at 4–5.

The Court finds that the plaintiffs' choice to base class eligibility upon the class members' plan members' states of residence fair and reasonable because it generally comports with the purposes of the states' antitrust laws. The IRC's and UnitedHealth's proposed alternative of pharmacy location, as pointed out by class counsel, is not necessarily better because most individuals purchase their pharmaceuticals in their state of residence, and even where that is not the case, basing class eligibility on pharmacy location would result in anomalous situations in which a Maryland resident, for example, could benefit from the District's *Illinois Brick* repealer, even though the Maryland legislature has chosen not to afford its residents such protections. Moreover, a substantial percentage of prescriptions are filled by mail order pharmacies, one of the largest of which is located

---

**41.** For support, the objectors cite the Nebraska Consumer Protection Act, Neb.Rev.Stat. §§ 59–1601(2) ("Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."); 59–1602 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."); 59–1603 ("Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful."); and 59–1609 ("Any person who is injured in his business or property by a violation of sections 59–1602 to 59–1606, or any person so injured because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of sections 59–1603 to 59–1606, may bring a civil action in the district court to enjoin further violations, to recover the actual damages sustained by him. . . .").

in Ohio, which is a non-United Wisconsin jurisdiction. Despite the encouragement to third party payors' members to use mail order prescriptions, the pharmacy-location approach would deny third party payors the benefit of recovery when their members used this feature. While the respective settlement amounts may not be perfect for all affected third party payors, it represents a reasonable compromise, which is perhaps best illustrated by the fact that even the objectors disagree with one another on this issue: the objecting IRCs and UnitedHealth would divide the funds equally between the classes, while the other objector, Health Net, would direct greater amounts of money toward states like California.

Third, the IRCs and UnitedHealth have lodged objections against the claim process. They contend that the two options for calculating payments for the purpose of submitting claims effectively exclude indemnity payments, in which the payor pays the pharmacist and is subsequently reimbursed upon submission of the claim to the insurance company. Normally, they point out, indemnity payors do not have a claim record detailing reimbursement for specific drugs and thus will be unable to provide the necessary claims information. Yet, here, indemnity payors would have to provide evidence of the claimed payment. They estimate that up to ten percent of third party payor claims are such indemnity payors. *See* 11/29/01 Tr. at 138–40. Such payors did not opt-out, the objectors explain, because they "found themselves in [a] catch–22":

> MR. SIMMER: ... To file a claim in this settlement, you had to have a specific claim record of your payments for these two drugs. Indemnity payors don't have

that, so they couldn't make a claim. Okay. One might ask, why didn't they opt out? Mr. Cohen has explained, to opt out of this settlement, you also had to provide data about your payments for these two drugs.

*Id.* at 139–40.

But the Court finds this objection misplaced and counsel's representation with respect to it rather disturbing. The Court agrees with the plaintiffs that the objectors would fare no better proceeding to trial, as they would have to demonstrate damages, and it would be unfair to permit this ten percent of the population to block the settlement for the other ninety percent when the ten percent simply could have opted out. What is appalling to the Court in relation to this objection is that in making the IRCs' case, counsel appears to have grossly misrepresented facts to the Court, as pointed out by class counsel:

> MR. COHEN: ... I have to go further than that, however, because Mr. Simmer, when asked why they didn't opt out, told the Court an absolute lie. He said that we didn't opt out because we had to provide—in order to opt out, we had to provide our claims information. He knows full well that is not true, that the class information was requested, not required. That was clarified in a letter prior to the deadline date. And, in fact, Mr. Simmer's firm did opt out for clients and provided no claims information. They knew full well that was not required.

*Id.* at 154. Needless to say, the Court finds no credibility in the objectors' counsel's arguments on the purported "catch 22."[42] The information for opt-outs in the United Wis-

42. At the hearing, in fact, the Court had to ask counsel repeatedly for a clarification of the objections' reasons for not opting out. The Court finds the responses of IRCs' counsel ambiguous and disgenuine, if not totally incredible. Counsel began by volunteering:

MR. RHOAD: ... Why we didn't opt out. That was the question posed by Mr. Cohen here today suggesting that our clients spoke with their feet, I guess is the term that he used, by remaining in the class. Well, the answer to that question—it's a very good question as a preliminary matter, but he answer is two-fold, Your Honor. And I believe that you will find

that both answers or both parts of the answer are compelling. While opting out may very well have been the easiest route for our client to take to demonstrate their dissent in this case, our clients have elected instead to taken a stand. They're concerned that if attempts are not made to correct the substantial problems they have identified with these proposed settlements, that there is the very real and significant risk that these same problems will affect settlement proposed in future cases of a similar nature.... The second concern of our clients, which compelled their election to remain in the class and submit objections rather than opt

consin settlement was requested, not required, and the plaintiffs made the request because that settlement, and not the Arkansas Carpenters settlement, was subject to a reduction provision if opt-outs exceeded a certain threshold and an SST termination provision if the opt-outs exceeded another threshold figure. The requested information was used solely to determine whether those thresholds were met. *See* 11/29/01 Tr. at 97–99. Requesting such information was reasonable.

Finally, UnitedHealth objects to the releases, citing a parade of horribles including potential violations of ERISA if third party payers who have no authority to do so release claims of beneficiaries. But the Court is satisfied with class counsel's explanation of the agreements' savings clause; it does not release the claims of beneficiaries and affiliates "to the extent that any such Person's claim is independent of such Person's relationship to Plaintiffs or Settlement Class Members." Settlement Agreement ¶ I.KK; *see also* 11/29/01 Tr. at 99.

For all of the reasons discussed above, the Court finds that the terms of the settlements, when compared to the strength of the plaintiffs' cases, are fair, adequate, and reasonable, and this factor accordingly favors final approval.

### (c) Status of Litigation at Time of Settlement

The plaintiffs had sufficient information at the time they entered these settlement

agreements. As discussed in significant detail above, class counsel conducted an extensive investigation from May 1999 to July 2000 relating to the claims and underlying events and transactions alleged in the complaints. During coordinated discovery, they reviewed hundreds of thousands of pages of party and non-party documents were reviewed, and in excess of seventy party and non-party depositions had been taken. They also consulted with experienced economics experts and ultimately retained John Pisarkiewicz, Ph.D. in August 1999, whose reports have been filed with the Court, to advise them on matters of class injury and damages.

### (d) Reaction of Class

Pursuant to the Court's preliminary approval order, over 13,000 copies of the Notice of Settlement of Class Actions, Proof of Claim, and Notice of Exclusion were mailed directly to class members in both actions. Out of large and sophisticated classes in each action, three sets of objections have been filed on behalf of a total of thirteen objectors. Only a handful of managed care companies and a small number of self-funded third party payor plans, totaling fourteen third party payors, have opted out of *United Wisconsin.* Similarly, only seventeen have opted out of *Arkansas Carpenters. See, e.g.,* 11/14/01 Affidavit of Bernard Persky ¶ 94.[43] The fact that such an overwhelming majority of class

out, is their recognition that the settlement funds established in this case of consumers and third-party payors ... is their recognition that the settlement fund established in this case for consumers and third-party payors is not insubstantial ... the problem here isn't necessarily the amount of the settlement fund, but rather the way the settlement fund has bee allocated among the parties....
11/29/01 Tr. at 119–21; *see also id.* at 149 (MR. SIMMER: ... "[A]s Mr. Rhoad explained earlier, what we're trying to do is take a stand here."). Far from "compelling," however, the Court finds the first, what the Court will deem "class action martyr" reason, unbelievable. Rather than having counsel write an op-ed in the *Wall Street Journal, New York Times,* or *Washington* Post, counsel incredibly asks the Court to believe that their clients wanted to remain part of a settlement that in their view was "terrible", while their colleagues opted-out, to set a better

precedent for class actions generally, despite counsel's statement that they "are all sophisticated companies ... [and] operate in a highly competitive market and they are very much concerned about their business operations." 11/29/01 Tr. at 118. The second reason therefore is much more credible, albeit entirely unhelpful to the objectors in that it bolsters the reasonableness of the settlement funds. *See supra* note 39. As perhaps best articulated by class counsel, "We heard quite a bit from the objectors as to why they didn't opt out. And I'll suggest that they never gave you the honest answer. They don't want to walk away from $25 million in [the United Wisconsin] case. That's why they didn't walk out." 11/29/01 Tr. at 154.

**43.** A Schedule of Opt–Outs for each case is attached as Exhibit 1 to the respective orders and final judgments, which accompany this Memorandum Opinion.

members elected to stay in the class evidences a favorable reaction by the class to the settlement. And although several objections were filed by a relatively few members of the class, for the reasons discussed at length above they ultimately present no obstacle to final approval. Accordingly, this factor supports final approval of the settlements.

### (e) Opinion of Experienced Counsel

Class counsel has substantial experience in litigating and resolving complex cases, including pharmaceutical overcharge antitrust matters on behalf of classes of sophisticated third party payors. *See, e.g.,* 11/14/01 Affidavit of Richard W. Cohen ¶ 4. Given the arms-length negotiations conducted by counsel, counsel's consultation with the plaintiffs' retained expert, and their extensive discovery and investigation, the Court will credit counsel's opinion that these settlements are fair, reasonable, and adequate.

### (2) Final Approval of the Allocation and Distribution Plan

For the specific reasons discussed at length above respecting the Allocation and Distribution Plan in each case, *see supra* pp. 392–97, the Court finds the plans fair and reasonable and will approve them.

### (3) Final Approval of Attorneys' Fees and Costs

In *United Wisconsin,* Third Party Payor Lead Class Counsel specifically seek approval of the following: (1) a fifteen percent attorneys' fee; (2) reimbursement of out-of-pocket litigation costs and expenses in the amount of $278,267.33; and (3) payment of an incentive award of $25,000 for each of the named plaintiffs. In *Arkansas Carpenters,* Third Party Payor Lead Class Counsel similarly seek: (1) a 22.5% fee; (2) reimbursement of $110,000 in costs; and (3) payment of an incentive award of $10,000 to each of the named plaintiffs in the *Middle Tennessee* and *Cement Masons* actions.

The IRCs and UnitedHealth object to the fee petitions. Pooling together the fees sought here by United Wisconsin Third Party Payor Lead Class Counsel, the fees sought by Arkansas Carpenters Third Party Payor Lead Class Counsel, and the $4 million sought by Indirect Purchaser Lead Counsel for the benefit of approximately forty-one firms representing the State Purchaser Plaintiffs, they contend that the $10 million in attorneys' fees is excessive when juxtaposed to the total recovery of $35 million. They allege that the respective Third Party Payor Lead Class Counsel did not earn the requested awards because they merely piggy-backed on the FTC's and Plaintiff States' work.

The Court disagrees. Under the legal standard and relevant factors detailed at length above, *see supra* pp. 382–84, the Court finds the attorneys' fees and costs petition in both cases fair and reasonable and will accordingly approve them. First, the objectors have erroneously conflated the relevant figures. Despite the fact that Indirect Purchaser Lead Counsel will receive a portion of the fees requested here, the $4 million fee that Mylan has agreed to pay them in connection with the settlement of the FTC's and Plaintiff States' action and dismissal of the State Purchaser Actions was separately negotiated and is wholly independent of the fees requested in these cases. It should be evaluated accordingly, as the Court has done. *See supra* pp. 384–85. Similarly, the fees sought here are independent of one another, as United Wisconsin Third Party Payor Lead Class Counsel and Arkansas Carpenters Third Party Payor Lead Class Counsel have litigated, negotiated, and settled their respective cases in an independent, albeit coordinated, fashion.

Second, counsel in both cases correctly note that the fifteen percent contingency fee sought in the *United Wisconsin* case and the 22.5% sought in the *Arkansas Carpenters* action are at the low end of the acceptable range of fee awards in common fund cases.[44]

---

**44.** Counsel in *United Wisconsin* negotiated 15% fee retainer agreements with the class plaintiffs at the outset of the case, and through a candid statement at the fairness hearing revealed the modest nature of the fees involved here:

> I can assure you that if I knew then what I now, I never would have agreed to the 15

As noted above, while fee awards in common fund cases range from fifteen to forty-five percent, the normal range of fee recovery in antitrust suits is twenty to thirty percent of the common fund. *See Swedish Hosp. Corp.,* 1 F.3d at 1271–72; *see also In re Aetna Inc.,* MDL No. 1219, 2001 WL 20928 (E.D.Pa. Jan.4, 2001) (finding thirty percent to constitute a reasonable award); *In re Ampicillin Antitrust Litig.,* 526 F.Supp. 494, 498 (D.D.C.1981) (noting that while the bulk of fee awards in antitrust cases are less than twenty-five percent, several courts have awarded more than forty percent of the settlement fund). Contrary to the objectors' conclusory speculation about counsel's efforts, this has been a lengthy and complex antitrust case, involving multiple jurisdictions, extensive investigation and discovery, coordination, and negotiations. Counsel in these cases are experienced antitrust litigators, and they have detailed their efforts in these cases in affidavits filed with the Court. *See* 11/14/01 Affidavit of Richard W. Cohen; 11/13/01 Affidavit of Joe R. Whatley, Jr.; 11/14/01 Affidavit of Bernard Persky; 11/13/01 Affidavit of Robert S. Schachter. As a result of their efforts, the United Wisconsin class members, numbering in the thousands, are expected to recover thousands of dollars each from a total ' fund of $25,285,600, and the estimated 13,000 Arkansas Carpenters class members will recover a total of $10,114,400.

With respect to costs, counsel in *United Wisconsin* seek reimbursement of out-of-pocket expenses totaling $278,267.33, and counsel in *Arkansas Carpenters* seek $110,000. In addition, the plaintiffs seek incentive payments of $25,000 to each of the three class representatives in the *United Wisconsin* case and $10,000 each to the three named plaintiffs in *Arkansas Carpenters; Middle Tennessee,* and *Cement Masons.*[45] The allocation for the out-of-pocket expenses is detailed in counsel's affidavits and has not been disputed, *see, e.g.,* 11/13/01 Affidavit of

Robert S. Schachter ¶ 8, and the Court finds the respective claimed expenses reasonable. The Court also finds the incentive awards to be reasonable under the circumstances. "Incentive awards are 'not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class.' . . . In fact, '[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.' " *Cullen v. Whitman Med. Corp.,* 197 F.R.D. 136 (E.D.Pa.2000) (quoting *In re So. Ohio Correctional Facility,* 175 F.R.D. 270, 272 (S.D.Ohio 1997)). Counsel has sufficiently explained that the named plaintiffs in both cases provided in-house counsel, fraud investigators, and pharmacy benefits managers to aid in the prosecution of this case, whose efforts included investigating, negotiating, responding to discovery demands, attending meetings, coordinating with other in-house counsel, and directing class counsel in settling the case. *See* 11/14/01 Affidavit of Richard W. Cohen ¶¶ 12–14, 17; Declaration of Carol Nakhuda, Esq. ¶¶ 5–6, attached to 11/13/01 Affidavit of Hollis L. Salzman, Ex. 3; 11/14/01 Affidavit of Bernard Persky ¶¶ 11–13. The aggregate incentive awards respectively represent approximately 0.3% of each class's recovery. As with the expenses, these requests are uncontested, and the Court finds them reasonable and will accordingly approve the petition.

### (4) Certification of Classes for Settlement Purposes Only

█ Finally, the United Wisconsin plaintiffs seek final certification of the following class for settlement purposes only:

All Third Party Payors (as described below) that have reimbursed or otherwise paid, in whole or part, for prescriptions of tablets of generic Lorazepam or generic Clorazepate (the "Drugs") filled during the period January 1, 1998 through December

---

percent standing here two and half years later. It's the lowest fee we've ever agreed to in one of these cases, and in our subsequent fee agreements we've refused to accept that given the complexities involved in these cases and the length of time it takes to collect.

11/29/01 Tr. at 105.

**45.** *See supra* note 7 and accompanying text.

31, 1999 (the "Class Period") for natural persons resident in Arizona, California, the District of Columbia, Florida, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, South Dakota, Tennessee, West Virginia, and/or Wisconsin (the "United Wisconsin Jurisdictions") (the "Settlement Class"). "Third Party Payor" means any non-governmental entity that is (i) a party to contract, issuer of a policy, or sponsor of a plan, which contract policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy or plan, to pay or reimburse the amount associated with the cost of prescription drugs to natural persons covered by such contract, policy, or plan.

11/15/01 Mot. at 2–3. The plaintiffs in *Arkansas Carpenters* similarly seek certification of the following class for settlement purposes only:

All Third Party Payors (as described below) that have reimbursed or otherwise paid, in whole or part, for prescriptions of tablets of generic Lorazepam or generic Clorazepate (the "Drugs") filled during the period January 1, 1998 through December 31, 1999 (the "Class Period") for natural persons resident in Alaska, Alabama, Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Iowa, Idaho, Illinois, Indiana, Kentucky, Maryland, Missouri, Mississippi, Montana, Nebraska, New Hampshire, Nevada, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Utah, Virginia, Vermont, Washington, and/or Wyoming (the "Settlement Class"). "Third Party Payor" means any non-governmental entity that is (i) a party to contract, issuer of a policy, or sponsor of a plan, which contract policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy or plan, to pay or reimburse the amount associated with the cost of prescription drugs to natural persons covered by such contract, policy, or plan.

11/15/01 Mot. at 2. A settlement class certification must comply with all four prerequisites of Rule 23(a) and one of the three subsections of Rule 23(b). *See Thomas v. Albright,* 139 F.3d 227, 234 (D.C.Cir.1998). Rule 23(a) permits certification only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.Proc. 23(a).

The classes meet all four requirements of Rule 23(a). First, there are over 13,000 class members involved in the cases, rendering joinder impracticable. *See, e.g.,* 11/14/01 Affidavit of Bernard Persky ¶ 94 & n. 20; Affidavits of Dawn E. Addazio ¶ 11, attached to 11/14/01 Affidavit of Bernard Persky, Exs. 2–3. Second, there are several questions of fact and law common to each class pertaining to the liability and damages for the alleged antitrust violations, as discussed at length above. Third, the plaintiffs' claims are typical of their respective class members in that they allege illegal combination, conspiracy, or agreement by the defendants which resulted in the anticompetitive injuries. Finally, the Court finds no conflicting interests with absent members of the class, *cf., e.g., supra* pp. 389–90, and it finds that the representative parties have a genuine interest in this litigation and that their counsel are qualified and experienced.

With respect to Rule 23(b), the plaintiffs have moved for certification under Rule 23(b)(3), which requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.Proc. 23(b). Rule 23(b)(3) further provides that matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or

against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.Proc. 23(b)(3).

The plaintiffs have satisfied the Rule 23(b)(3) requirement as well. They correctly highlight the fact that predominance is readily met in these types of cases, which allege violations of antitrust laws. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."). The Court does not find this case to be an exception considering the nature of the complex issues involved in this antitrust case that are common to the class. And the Court is satisfied that the class action is superior for handling the claims of the 13,000 individuals involved in these cases nationwide; addressing them individually obviously would waste judicial resources and result generally in great inefficiency. The Court therefore will grant class certification in each case for settlement purposes only.

### III. CONCLUSION

For the foregoing reasons, in the FTC/Plaintiff States' action the Court will: (1) grant final approval of the Mylan Settlement Agreement and the SST Settlement Agreement; (2) grant final approval of the Plaintiff States' proposed distribution plans; (3) grant final approval of the payment of the costs of notice and claims administration; (4) grant final approval of the payment of the Plaintiff States' attorneys' fees and litigation costs; and (5) grant certification of the appropriate class for settlement purposes only. In each of third party payor actions, the Court will: (1) grant final approval of the Settlement Agreement; (2) grant final approval of the Allocation and Distribution Plan; (3) grant final approval of the petition for attorneys' fees, litigation expenses, and incentive awards; and (4) grant certification of the respective class for settlement purposes only. Appropriate final judgments and

orders will accompany this Memorandum Opinion.

### ORDER AND FINAL JUDGMENT

**WHEREAS** the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, and the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia, through their Attorneys General, and the District of Columbia through its Corporation Counsel ("Plaintiff States" as defined below), and the Federal Trade Commission ("Commission"), have filed Complaints for damages, divestment, disgorgement, restitution and other equitable relief, injunctive relief, and civil penalties against the defendants Mylan Laboratories, Inc., Gyma Laboratories of America, Inc., Profarmaco S.r.l., and Cambrex Corp. ("Settling Defendants"), alleging violations of the Sherman Act, Federal Trade Commission Act, and state antitrust and unfair competition and/or consumer protection laws.

**WHEREAS** Plaintiff States, the Commission and Settling Defendants desire to resolve any and all disputes arising from the Complaints. The parties executed a settlement agreement on January 30, 2001 (the "Mylan Settlement Agreement"). The Mylan Settlement Agreement was filed with the Court on February 1, 2001. The Mylan Settlement Agreement does not constitute any evidence against or an admission of liability by the Settling Defendants.

**WHEREAS** in full and final settlement of the claims set forth in the Complaints, Mylan Pharmaceuticals, Inc. has paid $100 million in cash, of which $71,782,017.00 was paid into a Consumer Fund, to be distributed in accordance with the Consumer Distribution Plan, and of which $28,217,983.00 was paid into a State Fund, to be distributed in accordance

with the Government Compensation Plan, as set forth in the Mylan Settlement Agreement. Mylan Pharmaceuticals, Inc. has further agreed to pay up to $8 million in cash into the Cost and Fee Account, as set forth in the Mylan Settlement Agreement. Settling Defendants have also agreed to entry of this Order and Final Judgment.

**WHEREAS** the Commission and Settling Defendants have entered into a Stipulated Permanent Injunction, which was approved by the Commission on November 29, 2000, Attachment 4 to the Mylan Settlement Agreement, incorporated herein by reference.

**WHEREAS** the Plaintiff States have also filed a Complaint for damages, divestment, disgorgement, restitution and other equitable relief, and civil penalties against SST Corporation ("SST"), alleging violations of the Sherman Act and state antitrust and unfair competition and/or consumer protection laws ("SST Complaint").

**WHEREAS** the Plaintiff States and SST Settling Defendant desire to resolve any and all disputes arising from SST Complaint. The parties executed a settlement agreement on January 30, 2001 (the "SST Settlement Agreement"). The SST Settlement Agreement was filed with the Court on February 1, 2001. The SST Settlement Agreement does not constitute any evidence against or an admission of liability by SST Settling Defendant.

**WHEREAS** in full and final settlement of the claims set forth in the SST Complaint, SST has paid to the Plaintiff States $500,000, c/o the Escrow Agent appointed pursuant to the Settlement Agreements, and the Plaintiff States' share of the $1 million payment made pursuant to SST's settlement in the Advocate Action. SST Settling Defendant has also agreed to the entry of this Order and Final Judgment.

**WHEREAS** Plaintiff States have agreed to release the claims of consumers residing in the Plaintiff States who have not submitted valid and timely requests for exclusion from the Settlement Group in accordance with the instructions contained in the Notice, and the Commission has agreed to release its equitable claims.

**WHEREAS** pursuant to a Preliminary Approval Order, Notice of the Settlement Agreements was given to the Settlement Group pursuant to Court order in accordance with Federal Rules of Civil Procedure 23(c)(2) and 23(e), state *parens patriae* laws and/or state equitable authority and the requirements of due process.

**WHEREAS** an opportunity to be heard was given to all members of the Settlement Group requesting to be heard in accordance with this Court's orders. The Court has reviewed and considered the terms of the Settlement Agreements, the submissions of the parties in support thereof, and the comments received in response to the Notice. After holding a hearing on November 29, 2001 at which all interested parties were given an opportunity to be heard,

**NOW, THEREFORE,** before the taking of any testimony, without trial or adjudication of any issue of fact or law herein, without any admission of liability or wrongdoing by Settling Defendants or SST Settling Defendant and upon the consent of the Parties hereto,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

## I. JURISDICTION

The Court has jurisdiction over the subject matter of this action and the parties hereto. The Plaintiff States brought this action asserting claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and claims under state antitrust, unfair competition and consumer protection statutes, and common law. The Commission brought this action under Sections 5 and 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 53(b). Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331, 1337 and 1367(a). Venue is proper in the District of the District of Columbia.

## II. DEFINITIONS

As used in this Order and Final Judgment, the following definitions shall apply:

A. "Advocate Action" means the action entitled *Advocate Health Care, et al. v. Mylan Laboratories, Inc., et al.*, which is one of the coordinated · cases in *In re Lorazepam and Clorazepate Antitrust Litigation*, 202 F.R.D. 12 in this Court.

B. "Agency Account" means a separate account, established within the State Fund, funded and distributed as specified in the Mylan Settlement Agreement.

C. "Class" means the class certified for settlement purposes only as provided in Section IV. hereof.

D. "Commission" means the Federal Trade Commission.

E. "Commission's Complaint" means the complaint filed by the Commission on December 21, 1998, as amended on February 8, 1999, against Settling Defendants in the United States District Court for the District of Columbia.

F. "Consumer Distribution Plan" means the plan and method of allocation of the Consumer Fund and the SST Consumer Fund submitted for this Court's approval by the Plaintiff States.

G. "Consumer Fund" means an interest-bearing escrow account, established pursuant to the Escrow Agreement, administered by the Escrow Agent and funded and distributed as set forth in the Mylan Settlement Agreement.

H. "Cost and Fee Account" means a segregated account established within the State Fund and funded as set forth in the Mylan Settlement Agreement.

I. "Court" means the United States District Court for the District of Columbia.

J. "Escrow Agent" means the person or entity chosen by the Plaintiff States and designated pursuant to the Escrow Agreement to administer the Consumer Fund and State Fund as set forth in the terms of the Mylan Settlement Agreement, and the SST Consumer Fund and SST State Fund as set forth in the terms of the SST Settlement Agreement.

K. "Escrow Agreement" means the escrow agreement, attached to the Settlement Agreements as Attachment 1.

L. "Government Compensation Plan" means the plan and method of allocation of the State Fund and the SST State Fund submitted for this Court's Approval by the Plaintiff States.

M. "Litigating Plaintiff States" means the 33 Plaintiff States that participated in the litigation and negotiation of the settlements of these actions: Alaska, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, and Wisconsin.[1]

N. "Mylan Settlement Agreement" means the Settlement Agreement between Plaintiff States, the Federal Trade Commission and Mylan Laboratories, Inc., Gyma Laboratories of America, Inc., Profarmaco S.r.1., and Cambrex Corp.

O. "Notice" means the notice or notices of these Settlement Agreements and hearing thereof that were disseminated to the members of the Settlement Group pursuant to this Court's Order of April 27, 2001.

P. "Notice Plan" means the Court-approved process by which the Plaintiff States notified the Settlement Group of the Settlement Agreements.

Q. "Parties" means Plaintiff States, the Commission, Mylan Laboratories, Inc., Gyma Laboratories of America, Inc., Profarmaco S.r.l., Cambrex Corp. and SST Corporation.

R. "Person" means any natural person, partnership, corporation, or business entity.

S. "Plaintiff States" means the Litigating Plaintiff States and any State that became a

---

1. For purposes of the litigation and this settlement, the definition of "Litigating Plaintiff States" or "Plaintiff States" does not include the University of California. It is stipulated by the Parties that the California Attorney General has not represented the interests of the University of California in the litigation or the settlement thereof, and the University of California has not been participating in this action.

party to the Settlement Agreements, through the State's Attorney General, individually and as authorized by law, in the state's sovereign capacity, on behalf of state agencies, in a statutory, equitable and/or common law capacity, and as representative of and/or *parens patriae* on behalf of all natural person citizens of such State who purchased either or both of the Relevant Drugs during the Relevant Period.

T. "Plaintiff States' Complaint" means the complaint filed by the Litigating Plaintiff States on December 21, 1998, as amended on February 8, 1999 and again on May 13, 1999 and the Third Amended Complaint filed by the Plaintiff States on February 1, 2001.

U. "Preliminary Approval Order" means the Court's Order of April 27, 2001 preliminarily approving the Settlement Agreements and establishing a schedule for Notice and further proceedings.

V. "Released Claims" means all claims, counterclaims, set-offs, demands, actions, rights, liabilities, and causes of action arising under federal or state antitrust, unfair methods of competition, or consumer protection laws, under state or federal unfair or deceptive trade practices acts, or under common law, asserted or that could have been asserted, by the Commission, by Settling Members of the Settlement Group, or by the Plaintiff States on behalf of state agencies and/or natural person consumers within the Plaintiff States against Settling Defendants and SST Settling Defendant arising from the facts, matters, transactions, events, occurrences, acts, disclosures, statements, omissions, or failures to act set forth or alleged in the Commission's Complaint or in the Plaintiff States' Complaint.

W. "Relevant Drugs" means generic lorazepam or clorazepate sold in the United States.

X. "Relevant Period" means the period from January 1, 1998 through December 31, 1999.

Y. "Settlement Agreements" means the Mylan Settlement Agreement and the SST Settlement Agreement.

Z. "Settlement Group" means all natural person consumers represented by Attorneys General for the Plaintiff States, individually and as authorized by law in a statutory, equitable and/or common law capacity, as *parens patriae* and/or as representatives of the Class.

AA. "Settling Defendants" means Mylan Laboratories, Inc. ("Mylan"), Gyma Laboratories of America, Inc. ("Gyma"), Profarmaco S.r.l. ("Profarmaco"), Cambrex Corp. ("Cambrex"), and any and all of their affiliates, subsidiaries, divisions and other organizational units of any kind, their successors and assigns, and their former, current and future officers, directors, employees, agents, attorneys, representatives, shareholders, partners and other persons acting on their behalf.

BB. "Settling Members of the Settlement Group" means each and every member of the Settlement Group who did not exercise his or her right to exclude himself or herself from the Settlement Group pursuant to a proper written request for exclusion postmarked on or before August 31, 2001.

CC. "SST" or "SST Corporation" means SST Corporation, a New Jersey Corporation with its principal place of business in Clifton, New Jersey.

DD. "SST Agency Account" means a separate account established within the SST State Fund, funded and distributed as specified in the SST Settlement Agreement.

EE. "SST Consumer Fund" means an interest-bearing escrow account established pursuant to the Escrow Agreement, administered by the Escrow Agent and funded and distributed as set forth in the SST Settlement Agreement.

FF. "SST Cost and Fee Account" means a segregated account established within the SST State Fund and funded as set forth in the SST Settlement Agreement.

GG. "SST Settlement Agreement" means the Settlement Agreement between Plaintiff States and SST Corporation.

HH. "SST Settling Defendant" means SST Corporation, and any and all of its affiliates, subsidiaries, divisions and other organizational units of any kind, their successors and assigns, and the former, current and future officers, directors, employees, agents, attor-

neys, representatives, shareholders and partners of each of the foregoing, and other persons acting on their behalf.

II. "SST State Fund" means an interest-bearing escrow account established pursuant to the Escrow Agreement, administered by the Escrow Agent and funded and distributed as set forth in the SST Settlement Agreement.

JJ. "State Fund" means an interest-bearing escrow account established pursuant to the Escrow Agreement, administered by the Escrow Agent and funded and distributed as set forth in the Mylan Settlement Agreement.

KK. "State Liaison Counsel" or "Liaison Counsel for Plaintiff States" means the Attorney General of the State of Ohio.

LL. "Stipulated Permanent Injunction" means the injunction entered into between the Commission and the Settling Defendants in the action entitled *Federal Trade Commission v. Mylan, et al.,* approved by the Commission on November 29, 2000, in the form of Attachment 4 to the Mylan Settlement Agreement.

### III. APPLICABILITY

This Order and Final Judgment shall apply to the Plaintiff States, the Commission, the Settling Members of the Settlement Group, the Settling Defendants, and SST Settling Defendant.

### IV. FINAL APPROVAL OF SETTLE-MENTS AND CERTIFICATION OF THE SETTLEMENT CLASS

A. With respect to the claims set forth in the Plaintiff States' Complaint, the Court confirms its Preliminary Approval Order and finds under the circumstances of these settlements that the prerequisites to a class action set forth in Federal Rules of Civil Procedure 23(a) and (b) are satisfied, that the questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Accordingly, for the purpose of these settlements only, a class consisting of

all natural person consumers within Plaintiff States where such a class action may be brought not otherwise represented by the Plaintiff States *as parens patriae,* who purchased generic lorazepam and/or clorazepate sold in the United States from January 1, 1998 through December 31, 1999

(the "Class") is hereby certified. The States within that Class are set forth in Section VI. below.

B. The Court finds that the Notice was the best notice practicable under the circumstances and constitutes due and sufficient notice.

·C. The terms of the Settlement Agreements are adjudged as fair, reasonable and adequate and in the best interest of consumers in the Plaintiff States and the Settlement Group as a whole, and satisfy the requirements of Federal Rule of Civil Procedure 23(e), state *parens patriae* laws and/or state equitable authority and due process.

D. The Settlement Agreements are hereby approved, and the Parties are directed to implement the settlements in accordance with their terms.

E. The Consumer Distribution Plan and claims procedure, and the Government Compensation Plan are adjudged as fair, reasonable and adequate and are hereby approved. Plaintiffs are directed to cause the settlement funds to be distributed in accordance with said plans.

F. All members of the Settlement Group were afforded the opportunity to exclude themselves from the Settlement Group.

G. All payments made by Mylan Pharmaceuticals, Inc. and SST Corporation pursuant to the Settlement Agreements are not, and shall not, be considered the payment of a penalty or fine under any state or federal laws, rules or regulations, or any other applicable statute or provision.

### V. INJUNCTION

The terms of the Stipulated Permanent Injunction entered into by Settling Defen-

dants and the Commission, which was approved by the Commission on November 29, 2000, shall be binding on all the parties to the Mylan Settlement Agreement, and may be enforced by the Plaintiff States for the term provided for in the Stipulated Permanent Injunction in the following manner.

A. Settling Defendants shall provide the notices and/or reports pursuant to Sections VI, VII and VIII of the Stipulated Permanent Injunction to State Liaison Counsel, c/o Chief, Antitrust Section, Office of the Ohio Attorney General, 140 East Town Street, 12th Floor, Columbus, Ohio 43215.

B. Communications involving the Stipulated Permanent Injunction shall be communicated to Settling Defendants by State Liaison Counsel. All such communications shall be addressed to Settling Defendants as provided for in Section XI(G) of the Mylan Settlement Agreement.

C. Each plaintiff State shall enforce Sections III, IV and V of the Stipulated Permanent Injunction through a committee comprised of the Offices of the Attorneys General for the States of Ohio, Maryland and Kentucky (the "Committee").

D. The Stipulated Permanent Injunction shall be enforced by the Plaintiff States by and through the Committee in the District Court for the District of Columbia.

## VI. DISMISSAL OF ACTIONS AND RELEASES OF CLAIMS

A. Subject to the provisions of Section IX of this Order and Final Judgment, the Commission's and the Plaintiff States' Complaints are dismissed with prejudice. The Commission, Plaintiff States, and Settling Members of the Settlement Group are barred from further prosecution of the Released Claims, and Settling Defendants and SST Settling Defendant are released and forever discharged from liability for the Released Claims.

B. The Court finds:

(1) The Attorneys General of the States of Alaska, California, Florida, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Texas, Utah, Virginia, Wisconsin and Wyoming pursuant to their respective state's *parens patriae* or equivalent authority, and additionally under Federal Rule of Civil Procedure 23, have the authority to represent, settle and release the claims of natural person consumers residing within their states.

(2) The Attorneys General of the States of Alabama, Arizona, Colorado, Delaware, Hawaii, Idaho, Maine, Missouri, New Hampshire, New Jersey, New Mexico, New York, Pennsylvania, Tennessee, Vermont, Washington, West Virginia, and the District of Columbia, pursuant to their respective state's *parens patriae* or equivalent authority, have the authority to represent, settle and release the claims of natural person consumers residing within their states.

(3) The Attorneys General of the States of Arkansas, Connecticut, Georgia, Indiana, Iowa, Nebraska, Oklahoma, and South Carolina have the authority to represent, settle and release the claims of natural person consumers residing within their states pursuant to Fed.R.Civ.P. 23.

(4) The Attorney General of the State of Maryland has, and the Attorney General of the State of Colorado further has, the authority to represent, settle and release the claims of natural person consumers residing within their states pursuant to their equitable authority under Md.Com.Law Code Ann. § 11–209 and § 6–4–111 C.R.S (2000), respectively.

(5) The Attorney General of the State of Washington has the further authority to bring equitable claims for the benefit of natural person consumers residing within her state, and to settle and release such claims, pursuant R.C.W. § 19.86.080.

## VII. FEES AND COSTS

The Court approves the funding of the Cost and Fee Account and orders Mylan to fund said account as set forth in the Mylan Settlement Agreement in the amount of $7,985,947.58. The Court approves the funding of the SST Cost and Fee Account as set forth in the SST Settlement Agreement in the amount of $125,000.00, and orders the

Escrow Agent in the Advocate Action to further fund said account with the Plaintiff States' share of the $1 million payment pursuant to SST's settlement in the Advocate Action if and when that settlement becomes effective, as defined in that settlement. Escrow Agent shall disburse the funds in the Cost and Fee accounts accordingly. The Court further approves the expenditure of up to $8,250,000.00 from the Consumer Fund for the payment of notice and claims administration costs, and the costs of securing approval of the Settlement Agreements.

## VIII.   FINALITY OF JUDGMENT

The Court finds that this Order and Final Judgment adjudicates all the claims, rights and liabilities of the Parties, and is final and shall be immediately appealable. Neither this Order and Final Judgment nor the Settlement Agreements shall constitute any evidence or admission of liability by any Settling Defendant or SST Settling Defendant, nor shall they be offered in evidence or used for any other purpose in this or any other matter or proceeding other than as may be necessary to consummate or enforce the Settlement Agreements or the terms of this Order and Final Judgment, or by any Settling Defendant or SST Settling Defendant in connection with any action asserting Released Claims.

## IX.   RETENTION OF JURISDICTION

Without affecting the finality of this Order, the Court retains jurisdiction for the purposes of enforcing the terms of the Settlement Agreements and enabling any of the Parties to this Order and Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary and appropriate for the construction or carrying out of this Order and Final Judgment for the modification of any of the provisions hereof, and for the enforcement of compliance herewith.

**SO ORDERED.**